# THE JAMES JACKSON.*

### (District Court, S. D. Ohio, W. D. November 25, 1881.)

1. **TOWING—COMMON CARRIER.**
   Semble, that a steamboat engaged in towing a barge is not a common carrier.

2. **TOWING-BOAT—BOUND TO REASONABLE SKILL AND CARE.**
   Although not held to the responsibility of a common carrier, the towing-boat is bound to the exercise of reasonable skill and care in everything pertaining to its employment.

3. **SAME—SAME—SPECIAL CONTRACT—NEGLIGENCE.**
   Semble, that a boat engaged in towing a barge cannot relieve itself by contract of the consequences of its own negligence.

4. **SPECIAL CONTRACT—BURDEN OF PROOF.**
   The burden of proving a contract that the barge was to be towed at the risk of its owner, is upon the towing-boat asserting such contract. In this case, held, that there was no contract to relieve the towing-boat of the consequences of its negligence.

5. **TOWING—BARGE OF OIL IN BULK—NEGLIGENCE—CASE STATED.**
   A steam-boat agreed to tow a barge, loaded with oil in bulk. The barge was new, and properly adapted to the purpose for which it was used. The barge sprung a leak and a considerable quantity of oil ran out upon the water or ice. This was probably caused by negligence of the towing-boat in handling the barge; but, whether that was the fact or not, those in charge of the towing-boat knew of the leak, and without examination as to whether the surface of the water was covered by oil, a shovel of fire ashes was thrown out upon the water, which ignited the oil and blew up the boat. Held, to have been negligence, and that the towing-boat was liable for the damage.

In Admiralty.

*Lincoln, Stephens & Slattery,* for libellant.

*Moulton, Johnson & Levy* and *W. H. Jones,* for respondent.

SWING, D. J. The libellant claims—

That on the twenty-first day of December, A. D. 1878, he was the owner of the barge Rice No. 1 and her cargo, consisting of 2,327 barrels of oil; that the barge was built expressly for towing oil in bulk; that it was new, and in every respect suited for such business; that the steam-boat James Jackson, through her owners, on the twenty-first day of December, 1878, agreed to tow said barge and her cargo from Pittsburgh, in the state of Pennsylvania, to Marietta, in the state of Ohio, and there safely deliver said barge and her cargo to the libellant for the sum of $45; that said barge and cargo were delivered to said steam-boat and taken charge of by her Saturday afternoon, December 21, 1878, at Pittsburgh, in pursuance of said contract; that said barge was, at the time, well and properly loaded, and was right and sound in every respect, and in good order and condition; that said boat did not deliver said barge and cargo as she agreed to, and did not proceed steadily upon her voyage, but laid up on Sunday night at New Cumberland, West Virginia, and

*Reported by J. C. Harper, Esq., of the Cincinnati bar.

afterwards so carelessly towed said barge and navigated their boat that they caused said tow and barge to be grounded in the Ohio river, at Brown's island, about five miles above Steubenville, Ohio, and also carelessly and negligently grounded said barge at the public landing at Steubenville; that said boat had a large tow, and carried an insufficient crew for its proper and skilful management, and delayed in leaving the port of Pittsburgh, and did not leave with their tow as they agreed to, and did not reach Steubenville, Ohio, with their said barge and cargo until Wednesday, December 25, 1878, about noon, and laid up there and put said barge and cargo just below and behind the steam-boat Oella, and the steam-boat James Jackson was also lying close to said barge and her cargo; that the said steam-boat, her officers and crew, so carelessly and negligently managed said barge and her cargo that, by their carelessness, said oil caught fire and exploded and burned up, whereby the barge and her cargo became a total loss; that said oil was worth $3,465.40, and said barge and outfit worth $1,250, making a total of $4,715.40.

To this libel the owner of this steam-boat, Andrew Lyons, answers, setting up three defences:

(1) That the seizure of the steam-boat was made south of a line of low-water mark on the West Virginia side, and therefore this court is without jurisdiction; (2) that by a special agreement between the parties the libellant was to assume all risks in the transportation of the oil; (3) denies that the barge was properly loaded, or that it was in a proper condition, and denies all negligence alleged.

In argument it was claimed that the steam-boat, in the performance of the service of the contract, was not a common carrier, and was not, therefore, subject to the rules of law governing common carriers in this: that she was not held to the highest possible degree of care and skill, and that she might contract to carry at the risk of the shipper. That the steam-boat engaged in towing a barge is not a common carrier would seem to be settled by the authorities. *Steamer Webb*, 14 Wall. 406; *The Margaret*, 94 U. S. 494; Desty, Shipping & Admiralty, 333.* Although not a common carrier, the steam-boat which engages to tow a barge is bound to the exercise of reasonable skill and care in everything relating to the work of towing the barge until the work is complete. Such being the relations and obligations of the steamboat in relation to the contract in this case, it is claimed by the respondents that it was perfectly lawful for them to provide that the towing of the barge should be at the risk of the owners thereof.

*See the recent case of *Mann* v. *White River, etc., Co.*, 8 N. W. Rep. 550, in which the supreme court of Michigan decided that log-driving and booming companies are not common carriers; and the excellent note of Mr. Ewell thereto, as to what constitutes a common carrier, in 20 Am. Law Reg. (N. S.) 734, 737.—[REP.

That there is a marked difference between the obligations, duties, and responsibilities of a common carrier and a private, carrier needs no citation of authority to establish; nor is it necessary in the present case to enter into any discussion in regard to wherein the difference consists. But just how far each may, by special contract, protect itself against the obligations, duties, and responsibilities is not quite so clear.

In *Railroad Co.* v. *Lockwood*, 17 Wall. 357, Justice Bradley, after a close and exhaustive examination of the authorities, and an able discussion of the principles governing common carriers, announces, as the decision of the supreme court of the United States, that they cannot exempt themselves by contract from responsibility for the negligence of themselves or their servants. In the *Steamer Syracuse*, 12 Wall. 167, it was a contract of towage, as the present, and it was claimed, as in the present case, that by special agreement between the canal-boat and the steam-boat, the former was being towed at her own risk. Justice Davis, in delivering the opinion of the court, says:

"It is unnecessary to consider the evidence relating to the alleged contract of towage, because if it be true, as the appellant says, that by special agreement the canal-boat was being towed at her own risk, nevertheless, the steamer is liable if, through the negligence of those in charge of her, the canal-boat has suffered loss. Although the policy of the law has not imposed upon the towing-boat the obligation resting upon a common carrier, it does require upon the part of the persons engaged in her management the exercise of reasonable care, caution, and maritime skill; and if these are neglected, and disaster occurs, the towing-boat must be visited with the consequences."

It is contended by the learned counsel for the respondent that the doctrine of the latter case is modified by the decision in the former. Whether this be so or not, the view which I take of the evidence in regard to the contract alleged renders it unnecessary to determine. The contract is affirmed by the respondent and denied by the libellant, and the burden of showing the existence of the contract and its terms rests upon the respondent. The respondent says that the words used were that he "would take no responsibility," and the captain sustains the statement of the respondent; but he is very clear that the respondent did not understand that this contract relieved him of responsibility for carelessness and negligence, for, to the question, "Your idea is that you were not responsible for the carelessness of your men?" he says, "I want to say that I am subject to whatever law governs these things. I did not make a contract to cover any care-

lessness or negligence. Accidents will happen among the most careful. I have had my works blown up five times and I was there myself."

This brings us to the consideration of the question whether the loss of this oil and barge was the result of negligence or carelessness on the part of those connected with the boat. In the first place, the proof clearly shows that the barge was a new and substantial one, properly fitted and prepared for the holding and transporting of a cargo of oil in bulk, and there is no testimony that shows that the accident occurred either directly or remotely from any fault which existed in the barge at the time the boat received her in tow. As to how the accident occurred I think there can be little doubt. It is shown by the evidence that a leak was discovered in the barge; that quite a stream of oil was pouring out upon the water or ice, and by the testimony of two men (Tucker and Parrish) that Tucker thoughtlessly threw out a shovel of fire ashes, which caught the oil upon the water, and the oil on the water took fire and ran to the barge, which blew up; and it would seem, from the testimony of Snider, that this was talked of among a portion of the crew as the cause of the loss after it had occurred. The character of these witnesses is not directly impeached. I know that there is a large amount of evidence from experts and scientific men to show the improbability of a shovel of fire ashes thrown upon the oil producing such a result, and yet they show that if flame were placed in contact with the oil upon water it might ignite. Who knows what flame may have been connected with these ashes and coals? No one. And the man who threw them upon the oil shows positively that the oil did take fire from them, and that this produced the loss. Was the act which produced this such want of care as to make the steam-boat liable? It is not clear what produced the leakage of the oil,—whether from a want of proper care the barge grounded, in the ordinary sense of the term, or whether it had grounded upon a cake of ice; from the weight of evidence it would seem that from one of these causes the leak was produced, and that ordinary care and watchfulness might have prevented it. But if this were not so, the leak, in fact, existed; the oil had run out in considerable quantities, and would have found its way to the boat. Those in charge of the boat knew of the leak, and, under such circumstances, without any examination to see if the surface of the water was not covered with the oil from the barge to the boat, a shovel of fire ashes is thrown upon the water, which ignited the oil and blew up the boat. As I view it, this was the want of such care as would make the

steam-boat liable.   I may be mistaken in my views, but if so I am glad to know that it is a case which can be appealed to the circuit court, where any errors of mine may be corrected.

Decree for the libellant.