## THE B. B. SAUNDERS.

## ORIENT MUT. INS. CO. *v.* THE B. B. SAUNDERS.

*(Circuit-Court, S. D. New York.* November 20, 1885.)

COLLISION—TUG AND TOW—STEAM-BOAT—NINETEENTH RULE OF NAVIGATION.

Where a tug, incumbered with a tow, proceeding on an ebb-tide at a suitable distance out in the channel, has, while keeping on her course, and pursuing a moderate speed, been brought into danger of collision by the violation on the part of a steam-boat of the nineteenth rule of navigation, and after doing all that could fairly be expected is not able to avoid collision, the tug cannot be held liable for damages to the tow and her cargo resulting from such collision.

In Admiralty.

*Butler, Stillman & Hubbard,* for appellants.

*E. D. McCarthy, Thomas L. Ogden,* and *Charles M. Da Costa,* for appellees.

WALLACE, J. The claimants, the owners of the steam-tug Saunders, have appealed from a decree of the district court in favor of the libelant for the sum of $8,600.66, rendered for damages sustained by the canal-boat Wilber and her cargo by a collision with the steam-boat Orient, while in tow of the Saunders, on the twenty-sixth day of September, 1879. 19 Fed. Rep. 118. The proofs in the district court were very meager. Two witnesses only were produced for the libelant: Toole, the owner of the canal-boat, who saw but little of the transaction, and Collins, the engineer of the Orient, who was in the engine-room and saw nothing. Upon this appeal no additional evidence has been produced by the libelant, and although further evidence was offered by the claimants it has not been considered, because the depositions were suppressed. 23 Fed. Rep. 303. The witness Toole was on the Wilber near the stern. He says the tug and tow were proceeding directly down the river, about one-third the way out from the New York shore, making about four miles an hour, the canal-boat being lashed on the port side of the tug, when he saw the Orient come out of the Harrison-street slip on a course directly across the river. His attention was distracted by his occupation on his own boat for a couple of minutes, and then he saw the Orient on the port side of his vessel, about 20 feet off, and she immediately struck his vessel on the port side, a little aft of midships. He thinks the Orient was making two or three miles an hour. The collision took place about noon on a clear day. The tide was slack. The Wilber soon filled and sank. The testimony of this witness establishes the foregoing facts, and there is no other satisfactory evidence to establish any material fact bearing upon the circumstances of the collision, or the question of the negligence of those in charge of either vessel, except the testimony of the engineer of the Orient. The engineer states that just before

the vessels struck he received a signal to slow, stop, and back, and his engine had commenced to back at the time the vessels struck, but he cannot say that his vessel had stopped her headway.

The libelant in the court below relied and now relies upon the position that the burden of the proof rests upon the Saunders to exculpate herself from the presumption of negligence. This position is in part based upon the admissions in the answer of the claimant. These admissions are as follows:

"The claimant alleges that the said steam-tug B. B. Saunders, having fastened the said canal-boat securely to her port side at pier 40, North river, proceeded out into the river until she was nearly in the middle thereof, and then she proceeded down the river with an ebb-tide on a course about parallel with the course of the river; that having reached a point about opposite the foot of Beach street, those in charge of the B. B. Saunders discovered the steamboat Orient emerging from the pier at the foot of Harrison street, pier 34, North river; that the Orient was then distant from the B. B. Saunders from one-third to one-half a mile, and bore between three and four points on the port bow of the B. B. Saunders, and was on a course about due west; that the B. B. Saunders continued on her course down the river, and very soon thereafter the said steam-boat Orient blew a signal of two blasts of her steamwhistle to the B. B. Saunders, which signified to those on board the B. B. Saunders that the Orient desired to pass across the river in front of the B. B. Saunders; that the pilot of the B. B. Saunders thereupon gave a signal to the engineer of his vessel to slow her engines; but almost instantly, and before the said pilot had time to do anything further, the said steam-boat Orient blew a signal of one blast of her steam-whistle, which signified to those on board the B. B. Saunders that the Orient intended to pass under the stern of the B. B. Saunders; that the pilot of the B. B. Saunders immediately replied to the said second signal by blowing a single blast of his steam-whistle, and signaled the engineer of the B. B. Saunders to go ahead at full speed, and then put her helm to port; that the order to the engineer was promptly obeyed, and the B. B. Saunders, under her port helm, commenced to run to the westward; but the Orient, disregarding the signal which she had given, and regardless of the duty resting upon her to keep out of the way of the B. B. Saunders and her said tow, continued with unabated speed and without change of course until she struck the said canal-boat as aforesaid; that the B. B. Saunders continued under a port helm until about the instant of collision, and until a collision was inevitable, at which time her pilot shifted her wheel to the starboard to make the impending blow easier."

The libelant's case is not established merely because it appears that while the Wilber was under the control and direction of the tug, and helpless in her own behalf, she was brought into collision with another vessel. The libel charges negligence against both the tug and the Orient. The tug was not a common carrier, and the highest possible degree of skill and care were not required of her. Her obligation was to exercise reasonable skill and care in everything relating to the undertaking in which she was employed. *The Margaret*, 94 U. S. 494. Negligence is sometimes inferable as a presumption of fact. If the act by which a person is injured is of such a character that, under similar circumstances, when due care is exercised no casualty ordinarily ensues, a presumption is raised against the person

responsible, which he must overcome by evidence of due care, or by showing some unusual circumstance with which he had no connection to which the result may fairly be attributed. *The Granite State,* 3 Wall. 310; *Transportation Co.* v. *Downer,* 11 Wall. 130; *Rose* v. *Transportation Co.,* 20 Blatchf. 411; S. C. 11 Fed. Rep. 438.

The English rule in admiralty in cases of collision is that the burden of proof is not on the claimant, even when he sets up matter strictly justificatory or excusatory, until a *prima facie* case of negligence is shown. *The Marpesia,* 4 P. C. App. 212; *The Benmore,* L. R. 4 Adm. & Ecc. 132; *The Abraham,* 2 Asp. Mar. Law Cas. (N. S.) 34.

While the facts proved or admitted would exculpate the tow from responsibility, and indicate fault on the part of the tug or of, the steamer, they fail to locate the negligence with the tug exclusively, or between the tug and the steamer jointly. They would indicate exclusive fault on the part of the steamer as conclusively as fault on the part of the tug. It is for the libelant to show which vessel is responsible, and the burden cannot be shifted upon either the tug or the steamer to exculpate itself, or prove fault on the part of the other. Such is the rule explicitly declared in *The L. P. Dayton,* 18 Blatchf. 411, S. C. 4 Fed. Rep. 834,—an authority which is controlling here, and which dispenses with any other citation.

What, then, is the fault attributable to the Saunders, upon the particular facts shown by the testimony or admitted by the pleadings? She was proceeding at a safe distance from the line of the piers and slips, at a moderate speed, on a southerly course, on a clear day, upon quiet waters, properly manned and equipped, with her tow securely fastened on her port side, when, according to the answer, she observed, between one-third and a half mile off, bearing three or four points on her port bow, the Orient emerging from the pier on a course about due west. As the two vessels were on converging courses, and the Orient had the Saunders on her own starboard bow, it was the duty of the Orient to keep out of the way of the Saunders, and the Saunders had the right to rely upon the observance of this rule by the Orient until the two vessels had approached so nearly as to involve risk of collision. Until that time the Saunders was not only blameless in not slackening her speed and in keeping her course, but it was mandatory upon her to keep her course. , When did the two vessels approach so nearly as to involve risk of collision? Certainly not until those in charge of the Saunders had reason to suppose the Orient would not or could not keep out of the way. There is nothing to indicate how far distant the vessels were at the time the Orient signaled that she desired to cross the bow of the Saunders. Although the Saunders immediately prepared to slow her engines, "almost instantly, and before the pilot had time to do anything further," before he had time even to signal assent to the proposition of the Orient, the Orient changed her purpose, and signaled that she would pass under the stern of the Saunders.

The reasonable inference from these circumstances is that the Orient was sufficiently distant to render either movement practicable, and that her pilot did not deem it to be necessary to slow or stop and reverse. The probability would seem to be that he did not make due allowance for the influence of the ebb-tide, which doubtless carried the Orient further towards the south, until it was too late for him to stop her speed. If this was the situation of the vessels, the pilot of the Saunders was justified in assuming, up to the time of the Orient's signal, that the Orient would not attempt to pass across the bow of the Saunders. It may be supposed that the pilot of the Orient thought he could pass safely across the bow of the Wilber if the tug would consent when he signaled to that effect; yet, as he almost instantly renounced that movement, it is also supposable that he did not deem it imperative, but only preferable, to attempt to cross her bow. However the fact may be, it certainly does not appear that prior to the time of the signal there was such danger of collision as required the Saunders to slacken speed, much less to stop and reverse. It does not appear that the speed of the Saunders was slackened in response to the first signal from the Orient. The pilot signaled the engineer to slow, but instantaneously signaled him again to go ahead at full speed. It cannot be fairly claimed from the allegations of the answer that the speed of the Orient had been checked, or that the engineer had been able to execute the first order, before the signal was given. Assuming that the Saunders had slackened speed, and assuming, also, that the collision might not have occurred if she had not done so, it remains to consider whether she was justified in slackening speed, or whether it was negligence on her part to do so without first assenting to the signal of the Orient. The answer is consistent with the theory that the Saunders would have answered the signal of the Orient and consented to the proposition if there had been time to do so before the Orient gave the contrary signal. If any appreciable interval of time elapsed during which the Saunders delayed answering the Orient's signal, negligence might be imputed; but even then it would depend upon the distance between the vessels, and upon the urgency of the situation, and as to these circumstances there is no evidence, but only conjecture.

The learned district judge was of the opinion that, under the rules and regulations of the board of supervising inspectors of 1875 for the government of pilots, the pilot of the Orient had the right to elect whether it was safer to pass across the bow or astern of the Saunders and her tow, and that, if he saw fit to cross her bow, it was his duty to signal his intention by two blasts of his steam-whistle; that it was the duty of the pilot of the Saunders to reply to this signal by two blasts of his steam-whistle; that the latter was in fault for not replying to said signal before directing his engineer to slow his engine; and that, as it could not be determined that this fault did not contribute to the collision, the Saunders is liable. The rules of the inspectors, as

they existed at the time of the collision, required steamers approaching each other as those were, in the fifth situation, to pass to the right of each other, and give and answer signals by whistle promptly, as if meeting head and head, or nearly so. According to the regulations the signal ordinarily to be given was a single blast of the whistle by one steamer, which was to be answered by a single blast from the other; but it was also provided by the regulations that if passing to the right should be deemed unsafe by the pilot of either vessel, the pilot first so deciding should give two short and distinct blasts of his whistle, and the pilot of the other vessel should promptly answer by two similar blasts of his whistle, and the vessels should then pass to the left. Whether the latter regulation was intended to apply under any other circumstances than when the vessels were approaching each other head and head, or nearly so, is questionable. In the view reached it is unnecessary to consider this question. The regulations are not to be interpreted so as to conflict with the positive requirements of the sailing rules of congress. The board of inspectors may establish regulations in harmony with these rules, or for their more effectual enforcement. Beyond this they have no authority to go. Rules 19 and 23 of congress are imperative to the effect that when two vessels under steam are crossing so as to involve risk of collision, the vessel which has the other on her own starboard bow shall keep out of the way of the other, and the other shall keep her course, subject to the qualifications of rule 24, prescribing a due regard to all dangers of navigation, and to any special circumstances which may exist in any particular case rendering a departure from the ordinary rule necessary in order to avoid immediate danger. Under these rules it was as imperative upon the Saunders to keep her course as it was for the Orient to keep out of the way.

Notwithstanding the inspector's regulations, therefore, the pilot of the Saunders was not bound to assent to the movements proposed by the Orient unless due regard to the particular circumstances of the situation required a departure from the ordinary rule. Consequently his failure to answer the signal of two blasts of the whistle from the Orient was not culpable unless it was apparent that the Orient could not safely pass astern the Saunders. There is no evidence, and nothing in the admissions of the answer to indicate, that the Orient could not safely do this. On the other hand, if the situation involved risk of collision, it was the duty of the vessels, under sailing rule 21, to slacken speed, or, if necessary, stop and reverse. A vessel which gives a signal to another vessel for a departure from the ordinary rule of navigation, must take the hazard of the consequences of making such a departure herself, whether she hears a response to such signal or not. *The St. John*, 7 Blatchf. 220. The pilot of the Saunders was therefore justified in assuming that the pilot of the Orient was prepared to take the consequences of the signal he had given, and in supposing that he would either attempt to pass in front of the Saun-

ders and her tow, or would immediately stop and reverse. Until these signals were given by the Orient he could properly assume that the Orient would keep out of the way, and therefore that there was no risk of collision. After these signals he could assume with equal propriety that there would be risk of collision if he went forward, because the Orient was about to attempt to cross his bow; and it was his duty, therefore, to slacken speed. If it was not his duty to do this, at least it could do no harm to slacken speed.

The answer alleges that almost instantly after the pilot of the Saunders signaled his engineer to slacken speed, the pilot of the Orient indicated a change of course by a single blast of his steam-whistle, to which the pilot of the Saunders immediately responded by a similar signal, and went ahead at full speed, putting his helm to port. In the absence of evidence to the contrary, it is to be supposed that he was placed in a critical situation where it might have been as dangerous to stop and reverse as to go forward. He is not to be deemed in fault for obeying the signal of the Orient when the latter had placed him *in extremis*, and when it was apparently more dangerous to stop after the Orient had determined to go under the stern of his vessel than it would be to go forward.

So far as appears, the case is one where a tug incumbered with a tow, proceeding on an ebb-tide at a suitable distance out in the channel, has, while keeping on her course and pursuing a moderate speed, been brought into danger of collision by the violation on the part of a steam-boat of the nineteenth rule of navigation, and where, after doing all that could fairly be expected, the tug was not able to avoid collision. In such a case any claim by the steam-boat of fault on the part of the tug would seem to be preposterous. The libelant may justly insist upon a more exacting application of the principles of negligence against the tug than would be enforced in behalf of the steamer. It is nevertheless incumbent upon the libelant to point out some infraction of duty on the part of the tug that contributed to the collision. This has not been satisfactorily shown, and the libel must be dismissed.