## THE MARY McWILLIAMS.[1]

## THE CITY OF BROCKTON.

## OLD COLONY STEAM-BOAT CO. *v.* THE MARY McWILLIAMS.

## DELAWARE & H. CANAL CO. *v.* THE CITY OF BROCKTON.

(*District Court, S. D. New York.* June 16, 1891.)

1. COLLISION—VESSELS MEETING IN HELL GATE—EAST CHANNEL—DUTY.
   Where large vessels attempt to pass each other in the easterly channel of Hell Gate, each, on the interchange of signals, is bound to keep on its own side of the channel.

2. SAME—CONFLICT OF EVIDENCE—STAND-POINT OF WITNESSES.
   The City of B., a large side-wheel steamer, bound to New York, and the tug M. M., with a barge on her port side, and bound east, met at Hell Gate, and exchanged a signal of one whistle, the meaning of which both understood to be that they could pass in the easterly channel, the middle channel being occupied by another steam-boat. In passing, the port paddle-wheel of the City of B. came in contact with the barge, which was sunk. Each boat claimed that the collision was caused by the failure of the other vessel to keep to its own side of the channel. Out of a great conflict of evidence the court adopted the testimony of the pilot of a ferry-boat which was coming up astern of the tug, he being in the best position for accurate observation and for a comparison of both sides of the channel, and on such testimony *held* that the tug was the encroaching vessel, and was liable for the collision.

3. SAME—AGREEMENT TO PASS IN EAST CHANNEL.
   On the evidence in this case, *held*, that an agreement by signal between large vessels to pass in the east channel of Hell Gate is not in itself a fault in either vessel.

In Admiralty. Cross-suits for damages by collision.
*Shipman, Laroque & Choate*, for the City of Brockton.
*Carpenter & Mosher*, for the Mary McWilliams.
*Bristow, Peete & Opdyke*, for the scow and libelant Fisher.

BROWN, J. The above libels grew out of a collision in Hell Gate at about quarter past 8 A. M., November 15, 1890, between the large side-wheel steamer City of Brockton, coming from Fall River to New York, and Barge 3295, loaded with coal, bound east with the flood-tide, in tow of the tug Mary McWilliams, upon the latter's port side. The place of collision was in the easterly channel, nearly abreast of Flood rock, and between that and the Astoria shore. The port quarter of the barge was carried against the paddle-wheel of the City of Brockton, and the former was so damaged as to sink almost immediately. The morning was somewhat hazy, but not so as to prevent vessels from being seen at a considerable distance. When the City of Brockton had so far passed Hallett's point as to open up the river to the south-west, the tug Mary McWilliams was seen off the Astoria ferry, or below; and soon afterwards a signal of one whistle was exchanged between them. The steamer Express was a short distance ahead of the City of Brockton, and went down the

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

middle channel. By the exchange of signals of one whistle the tug and the steamer understood that they were to pass each other in the easterly channel; and it thereupon became the duty of each, in my judgment, to keep to the starboard side of the middle of that channel, because so much room was necessary to each for a safe passage, and there was nothing in the situation to prevent either of them from keeping on the right-hand side. A single boat in tow along-side could be very easily handled by the tug; and, the evidence being unanimous that there was no difficulty or danger in the attempt of the steamer and the tug to pass each other in this channel, I am not at liberty, upon the evidence in this case, whatever my private opinion may be, to treat their agreement by signals to pass there as either dangerous or as in itself a fault in either. But the breadth of available water is only about 600 feet, and that is so hampered by the indirect set and bends in the tide currents and in the channel way above and below that in my judgment any attempts to pass in the case of large vessels like the City of Brockton are highly dangerous, unless each, upon the exchange of signals, keeps on its own side of mid-channel. Whether that be so or not, however, it was the duty of each to act according to its whistles, and to give the other room to pass safely, and to keep upon her own side of mid-channel if that was necessary. *The Dentz*, 29 Fed. Rep. 525. The case has been tried on that theory. The tug claims that she did keep on her side of mid-channel, and that the collision was wholly owing to the steamer's intrusion upon the southerly side of the channel; while the steamer claims she passed within 50 feet of Flood rock, and that the collision was solely owing to the tug's inattention, and to her neglect to shape her course properly in time, or in accordance with her own signals, so as to give reasonable room for the City of Brockton to pass.

The evidence as to the position of the boats at the time of collision is very conflicting, and has occasioned me much embarrassment. This conflict is not confined to the witnesses upon the vessels immediately concerned, but extends to other witnesses, apparently disinterested. On the whole, considering the position of the different witnesses, the probabilities of the case, and the minor circumstances of corroboration, I think the weight of evidence is in favor of the City of Brockton; that she went as near to Flood rock as was safe to go; that the tug, at the time of collision, was negligently on the westerly side of mid-channel; and that she did not, in accordance with her duty after her signal of one whistle, give the City of Brockton sufficient space to pass, as she might and ought to have done; and that the collision arose from that cause. In coming to this conclusion, I would not and do not reflect in the smallest degree upon the integrity and good faith of the witnesses for the tug. The question is one entirely of accuracy in the estimate of distances, or as to the proportion of the distance across the channel that the vessels occupied at the time of collision. There was nothing to indicate the westerly line of the channel save the flag-staff that rose from the remains of Flood rock, or the small portion of the rock itself that may have been above water. This was either hidden from those of the tug's wit-

nesses that were on shore at the time of collision, or was not noticed by them; so that they had absolutely no means of correcting their estimates of the part of the channel-way which the boats occupied at collision, but simply estimated the distance from the Astoria shore. Estimates made in this way are extremely liable to error, and all the more so when made with reference to so large an object as the City of Brockton. The witnesses on the Express were in a much better position to estimate the relative position of the colliding vessels, although not in the best position; for they could see Flood rock and the Astoria shore, and they estimated the City of Brockton to be within 50 feet of Flood rock,—very much nearer than the witnesses on shore estimated the tug to be to that shore. The witness in the best position of all for accurate observation and for a comparison of both sides of the channel-way was Pilot Ward, of the ferry-boat Thomas Brennan, on her way from Blackwell's island to Ward's island, which came up astern of the McWilliams, and was from 600 to 800 feet below her at the time of collision. His boat being much faster than the tug, he might have passed to the eastward of her, as he says, because she was so far over to the westward in the channel; but he forebore passing her, lest in the somewhat hazy weather they might get all abreast at Hallett's point, and get into trouble with other boats that might be coming from the eastward, and he therefore stopped his boat. The whole easterly passage was directly open to his observation, and the courses of the steamer and the tug. He testifies that the steamer kept well over towards Flood rock, as near as was safe, and within 50 or 60 feet of it. On cross-examination, it is true, he says that the staff on Flood rock was hidden by the Brockton's bow at the moment of collision, but this confirms his account; for the staff and the distance between it and the steamer were in view until the steamer's bow had lapped Flood rock, so that he had perfect opportunity to observe how near it she went; and the very fact that the staff was obscured by the steamer's bow at collision itself proves that the steamer must have been well over towards the rock, and very near it, because otherwise the rock and staff would not have been obscured from Ward's position, and they could not have been obscured had the steamer been where the opposing witnesses suppose. This witness is not only disinterested, but is apparently a very capable and intelligent man, so far as disclosed, without any sympathies for either side as against the other. This is not so true of Bickel, who was perhaps in the next best position for a correct estimate. He was about 300 feet, he says, below the boats at collision, and on the dredge immediately below Flood rock. While supposing that the Brockton was 300 feet out from Flood rock, he confirms the witnesses for the latter in their contention that the tug, until very shortly before collision, was all the time moving over towards the line of the Brockton's course, instead of keeping parallel with the Astoria shore. Several times, and in different ways, he says in substance that the tug came up heading somewhat off from Astoria shore until just before she struck, when she headed in towards Astoria. Pilot Ward says: "The tug was falling off towards the Brockton, and apparently paying no heed to her; just com-

ing along carelessly. She came out and swung across our bow;" and as he lay drifting behind her "she was on his port hand," and was so at collision. The evidence shows that there was some set of the flood-tide from Astoria ferry towards Flood rock; but the evidence of both the witnesses last named, in connection with the proof of the abundant power of the tug, with only a single barge in tow, to go where she liked, deprives her of the defense that her set towards Flood rock, and upon the line of the necessary course of the Brockton, was unavoidable. To make that plea good, it should at least have been proved that her head was put towards the Astoria shore in time sufficient to counteract the alleged set of the flood-tide. That is what some of her witnesses allege; but the evidence of the several witnesses from the Brockton to the contrary, confirmed as it is by Pilot Ward, as well as by Bickel, proved that not to be the fact, but that she went in the Brockton's way, either through inattention or miscalculation,—it is immaterial which. I think the weight of evidence is also that the Brockton had stopped before collision, and that that was all she could safely do in her position; so that I cannot find her in fault. In the case of *The City of Springfield*, 26 Fed. Rep. 158, I held that it was dangerous navigation for a tug of small power, with a scow on her port side, and three other boats on her starboard side, to undertake to come down to the westward with the ebb-tide, hugging Hallett's point in the easterly channel, and to meet and pass a large steamer going up abreast of Flood rock, without signals; and that it was the duty of the descending steamer so incumbered to take one of the other channels, keeping to the right. The case largely turned on the ability of the tug to control the movements of such a tow in coming down on the ebb which sets towards Flood rock. The tug there was not able to control herself properly, though the steamer was on the westerly side of the channel. In this case the evidence is in all respects different, both as to the ability of the tug, and as to the safety of meeting and passing in the easterly channel by vessels like these; while the middle passage is proved to have been occupied by the Express, a much slower vessel, just ahead of the City of Brockton, which prevented the latter from taking that course, except with considerable embarrassment. She might, indeed, have gone around to the north of Mill rock by the main ship-channel; but it cannot be held a fault in her that she did not adopt that course, upon the evidence as it stands in this case, viz., that the two might meet and pass without difficulty or danger in the easterly channel, after timely signals had been exchanged and a common understanding had been had to that effect. Decrees may be prepared in accordance herewith, with costs.