### THE PLOVER and THE R. S. CARTER.

### THE AMERICA.

(District Court, E. D. New York. March 30, 1900.)

1. COLLISION—NEGLIGENT NAVIGATION OF TUG WITH TOW.
    It is as much the duty of a tug with a tow to so shape her course as to prevent collision by a crossing vessel with her tow as with herself, and a failure to exercise due care in that regard will place her in fault for a resulting collision.

2. SAME—STEAM VESSELS CROSSING.
    One of two vessels crossing, which takes such precautions as will insure the safe passage of the vessels if both are properly navigated, cannot be held in fault for a collision resulting from the improper navigation of the other, which could not have been anticipated.

In Admiralty. Cross libels for collision.

Robinson, Biddle & Ward (Mr. Hough, of counsel), for the America.
Eustis, Jones & Govin, for the Plover.
Cowen, Wing, Putnam & Burlingham, for the R. S. Carter.

THOMAS, District Judge. On the forenoon of December 9, 1898, there was a collision between the America, a tug 95 feet in length, with a loaded car float some 250 feet in length, on her starboard side, and the tug Carter, which had in tow a brigantine on a hawser

of 25 fathoms. The collision was on an ebb tide in the East river, nearly abreast Fulton Ferry, and some 400 or 500 feet from the Brooklyn shore. The America, bound for Jersey City, was heading not more than 2½ points south of west, and generally towards the New York shore. The Carter was headed up the river on a course that crossed the America's bows. When the tugs were about 1,500 feet apart, each gave one whistle, and thereupon ported, so that they passed at an interval of 75 or 100 feet. The brigantine continued substantially on her former course, and collided with the America at the latter's pilot house, from which the injuries accrued to each vessel that are the subject of the above actions.

The evidence of the America is that the brigantine was by the head, and therefore obeyed her helm somewhat tardily, and, although following the tug before the signals, did not do so thereafter, but took a sheer to port, which was continued until the time of contact. But it is perfectly clear that there was no "sheer," in the proper sense of the term. When the Carter went to starboard, the hawser was slackened, by her porting and slowing down, so that the brigantine, instead of following in the wake of the Carter, kept on the course theretofore pursued by her, and was not substantially arrested nor deflected by the hawser tightening before the collision. The evidence makes this fact certain. Now, who was at fault for this? The problem that confronted the tugs was not only to pass each other, but so to maneuver that the brigantine and America should also pass. The tugs ported early enough and sufficiently to allow for their safe passage, but not for that of the brigantine and America. The duty of each tug was to do her part to effect the necessary result. The Carter should have considered that it was not only necessary for her to change her crossing course so as to aid in passing the America, but also to do her part to check her tow, and to turn it from the crossing course, and thereby to keep it out of the way of the America. Instead of this, she went to starboard, and at the same time slowed down to such an extent that she lost control of her tow, and it went on its way, and she hardly got strain again upon her hawser before the accident. The evidence of the Carter's captain plainly shows this. He did not even look back to see whether his tow was following him, until his attention was called to its action by the captain of the America, when he hooked up again, and, when he saw that collision was impending, as a last resort he starboarded to throw the stern of his tug around, and thereby, if possible, jerk the head of the brigantine from the course of the America. Why did he slacken his speed? Why until warned was he unobservant of his tow? He states that he slowed down because he wanted to get back on his "course so as to carry the brigantine under the middle of the bridge just as near as possible." This seems to mean that he did not desire to get too much out of the course which he had shaped, and thereby cause himself delay, and therefore he slackened his speed so as to leave the brigantine with her existing heading. At least that was the result. And he states that whatever he did had very little effect upon the brigantine.

His claim is that the America did not go to starboard, and that the tugs passed with a distance of about 100 feet between them. This would show beyond peradventure that the brigantine went to port sufficiently to cover the space between the Carter and the other tug; for, as the captain of the Carter says, the brigantine changed a little, but not much. What right had the master of a tug to change his course so ineffectually that his tow made but little change from her course? He was under as much obligation to see that his tow did her part as that the tug did her part. Both are regarded as the same vessel, for the purposes of navigation. The fact that the brigantine did not feel the hawser until about the time of the accident, and then responded little, if any, shows that the Carter acted well for herself, but negligently for the tow.

Did the America contribute to the accident? Her captain states that he ported at the time of the interchange of whistles, and that when he saw the brigantine sheer he ported still more. The captain of the Carter also states that the America ported, but his reference is to the time of the second porting of the America, as alleged by her captain. The captain of the Carter also states, somewhat irresolutely, that the America was headed for the Brooklyn shore at the time of the accident. Such condition is inconceivable, as such heading would have been without usefulness, motive, or custom. A vessel with her destination would not have headed nearer to the Brooklyn shore than S. W. by W. $\frac{1}{2}$ W., and that heading would have been away from it. The combined result of the starboard deflection of the two tugs was to allow them to pass each other at an interval of about 100 feet. Had the Carter not slackened her speed, thereby allowing the brigantine to keep on her first course, the hawser would have been kept taut, and her tow would have followed the tug's course to starboard with measurable accuracy. At least, the brigantine would not have traveled to the port of the Carter for the 100 feet which separated the tugs. While it was the duty of the America to do her part in turning out, so that she would not collide with the tug or her tow, it was not her duty to expect that the Carter would slow down, slacken her hawser, and let her tow keep on the first course, nor was the America obliged to go to starboard in the expectation of such event, or sufficiently to meet such event. The 100 feet between the tugs would have been sufficient to allow the America and brigantine to pass had the Carter kept her speed, and consequently her hawser drawn on the brigantine, and this failure of the Carter was not expectable by the America, and she was not bound to act in anticipation of it. Loss of speed of the Carter was the vital error. From it all the consequences sprung, and to it alone the injury must be ascribed. The Carter simply, to a great extent, withdrew her power from the brigantine, and allowed the latter to go whither she would. The America charges that the brigantine was in fault in not steering properly, but offers no evidence on the point, and the captain of the Carter exculpates the brigantine from such charge, and gives her a certificate of suitable conduct. The facts tend to justify this. The Carter, by slackening the hawser, took from the brigantine her only

power of motion. The ebb tide, setting against her starboard bow, tended to keep her from going to starboard, and to turn her down the river in the opposite direction, and hence to thwart any attempt to steer her. She had headway enough to keep on and strike the America, but probably not enough to steer readily to starboard with an adverse tide. While her seeming failure to respond to any appreciable extent to her rudder, if her helm was properly ported, is not entirely satisfactory, yet the court is inclined to follow the opinion of the master of the Carter, who saw no fault in her conduct. It results from the foregoing views that the America should have a decree for damages and costs against the Carter, while the libel as to the brigantine should be dismissed, with costs, and the action by the owners of the brigantine against the America should be dismissed, with costs.