GREEN et al. v. COMPAGNIA GENERALE ITALIANA DI NAVIGAZIONE.

(Circuit Court of Appeals, Second Circuit.   May 24, 1900.)

No. 125.

COLLISION—STEAMER AND SAILING VESSEL—INSUFFICIENT LOOKOUT.
    Evidence considered, and *held* to sustain a finding that the failure of a
    steamer to keep a vigilant lookout was a contributory cause of a collision
··· between the steamer and a bark, the lights of which were not made out
    by the lookout until very shortly before the collision.

Appeal from the District Court of the United States for the Southern District of New York.

This cause comes here upon appeal by the respondents from a decree of the district court, Southern district of New York (82 Fed. 490), dividing the damages resulting from a collision between the steamship Orione and whaling bark Swallow, which happened about half an hour after midnight, March 31, 1895, some 250 miles off the coast of Brazil.

Lorenzo Ullo, for appellant.

Eugene P. Carver, for appellee.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

PER CURIAM.   The case in this court differs from that submitted below, in that there are some propositions no longer in dispute.   The libelant has not appealed, and therefore it must be assumed that the bark was herself in fault; that, from "the uncertainty and contradictions in the testimony in the libelant's behalf," it appears that there was "obvious negligence" in her navigation.   It will not be necessary to repeat the detailed statements of the district court as to her probable movements.   She was taken aback, the wind being light and baffling, and, after a greater or less amount of "sagging" and "drifting back," got back to her course again.   It will be necessary only to inquire whether there was sufficient evidence to warrant the further finding that the steamer "kept a negligent lookout," and therefore failed to see the Swallow's lights earlier, and thereby secure time sufficient to maneuver so as to avoid her.   Here, again, we are helped by the concession that the lights were not seen as soon as it might be expected they would have been.   The entry in the log of the Orione, written within 24 hours after the collision, contains this statement:

"The undersigned believes that the sailing vessel put up the side lights a few minutes before the collision, because, if he had the side lights, that could have been seen before, because the night was somewhat clear, so as to be able to distinguish the side lights at a far greater distance, inasmuch as hardly two minutes passed from the time of seeing the side lights to the collision."

The second mate, Zicavo, was in charge of the navigation of the steamer.   He testified that he saw the Swallow's red light almost at the time the lookout signaled it.   He estimates the distance at 800 to 1,000 meters, and the time from sighting to collision at two to three minutes.   The steamer was making about 14 knots.   Renzetti, the lookout, who sighted and signaled the light, makes the time to collision three to four minutes; Podesta, on the lookout bridge, "only a

few minutes." For reasons which will be indicated hereafter, we think the lowest of these estimates is nearest right, although probably an overestimate; and it is quite apparent that it might be expected the bark's light would be sighted much sooner, and when the vessels were much further apart. There is strong confirmation of the theory that the light was not seen till the vessels were close together in the conduct of Zicavo. It was a red light which the lookout reported, and which he saw. To port to such a light was proper navigation; careful watch meanwhile being kept in order to see if further change of helm or speed was needed. Zicavo at once ordered the helm hard a-port. (Really, the order was, "Hard a-starboard;" but the steamer was Italian, so the equivalent in the glossary of our own navigation is substituted in the text.) Evidently he was surprised, startled, finding himself unexpectedly confronted with a red light near at hand, as if suddenly flung up out of the darkness. Now, this effect of a sudden presentation of a red light to the eyes of the watchers on the Orione could have been brought about by one or another of three causes only: First. Before the moment of its presentation there might have been no red light at all. This was the theory adopted when the entry was made in the log, but it cannot be accepted here, in view of positive evidence from the bark that both her lights had been set and burning, when there is no evidence, direct or circumstantial, other than the steamer's belated observation of the light, to sustain such theory. Second. It might be that the light was there, but that something obscured it from view. This is the appellant's theory. There is no suggestion of any obscuration by sails, but it is contended that the result of the Swallow's being taken aback was that before she could get back to her course she had swung so far around that the sidelight screens, cutting off their respective lights at two points abaft the beam, would render them invisible to any observer located on the steamer, and that such obscuration continued for some time. The evidence from the Swallow as to these movements is most confused and somewhat contradictory. Nevertheless the positive and reiterated statement of Rodette, the boat steerer, that he saw the steamer's lights two points abaft the lee beam,—aft of the main rigging,—lends strong support to the theory that the bark was at some time in the position described. But, if she were, that circumstance does not decide the question as to the vigilance of the steamer's lookout. If the bark were swung completely around, presenting her stern to the Orione, she could get back on her course, as she undoubtedly did before collision, only in one of two ways,—either by luffing or by wearing. The evidence will not sustain the two propositions, that she wore and that the steamer's lookout was vigilant, because such a maneuver would have presented her green light to the steamer for some time before the red light became visible, and the steamer's evidence is positive that no green light was seen before the red suddenly appeared. If appellant's theory as to change of position be accepted, it must be taken that she came back to her course by luffing. Of this suggestion the district judge said:

"In such case the bark's red light must have been visible from five to ten minutes before collision, and the bark's change of condition, though constant

and deceptive, must have been comparatively very slow, and could not have been sufficient to prevent the steamer from avoiding her, had timely notice been taken by the bark, and had the steamer hard a-ported even a minute before collision."

When we take into consideration the course and character of the wind, the slow speed of the bark even when on her course ($3\frac{1}{2}$ to 4 knots only), the long arc through which she had to swing her bows in order to get from a position where the steamer bore 2 points abaft her port beam to one where she showed her green light to the steamer, as she did just before collision, and the fact that, during the long effort to get back through the teeth of the wind to her starboard tack, she was showing her red light to the steamer, we fully concur in the conclusion of the district judge, and cannot understand how the steamer could possibly come in contact with the bark thus maneuvering, if, seeing her red light nearly half a mile away, she at once hard a-ported, and kept on under a hard a-port wheel at a speed of 14 knots an hour. The only other possible explanation of the sudden appearance of the red light is the failure to keep a vigilant lookout, and we therefore concur with the district judge in the finding that the steamer's negligence in that regard contributed to bring about the collision. The decree is affirmed, with interest and costs.