### THE ALABAMA.

### THE CURTIN.

#### (District Court, E. D. Virginia. February 19, 1902.)

1. COLLISION—EVIDENCE—MAINTENANCE OF LIGHTS.
   The positive testimony of credible witnesses, who were in a position to see, that the lights were set and burning on a vessel at the time of a collision, is entitled to greater weight than the negative testimony of other witnesses that they did not observe such lights.

2. SAME—STEAMER MEETING TUG WITH TOW—DUTY OF CARE.
   The duty rests upon a steamer, having full control of its own movements, to keep out of the way of a tug with a tow, which occupies the position of an incumbered vessel.

3. SAME—STEAMER AND BARGE.
   A steamer, which, on leaving her wharf in the night, saw the lights in the channel ahead, indicating the presence of a tug with other vessels in tow, was bound to proceed with caution, and at a speed which would enable her to keep out of the way and avoid collision, and must be held in fault for a collision, which occurred within four lengths of her pier, with a barge constituting a part of the tow, which had been cast off, and was moving by its own momentum, alone, toward the shore to an anchorage, and carrying proper lights.

4. SAME—NEGLIGENT NAVIGATION BY TUG.
   A tug which was navigating a narrow and much frequented channel on a dark night with four barges in tow, and which elected to take the left-hand side of the channel, which placed it in the track of outgoing steamers, was bound to the exercise of extraordinary care to guard against collision between such steamers and the vessels of its tow, and it failed to exercise such care in sheering one of the barges under its own momentum across the space intervening between it and the shore, which was considerable, where it would be directly in the pathway of any steamer passing on that side, and without power to control its movements, and must be held in fault for a collision between such barge and a meeting steamer.

5. TUG AND TOW—ANCHORAGE OF TOW—CARE REQUIRED OF TUG.
   The law imposes upon a tug the duty of exercising reasonable care and caution and maritime skill in everything relating to the safe anchorage of its tow, and it is liable to any one injured by its negligence in that respect.

In Admiralty. Libel in rem to recover damages for collision.

This is a libel by the owner of the C. C. McIlvaine to recover damages sustained in a collision with the Alabama on the evening of the 16th of January, 1900, in the harbor of Norfolk, Va. On the day in question the McIlvaine, along with three other barges,—the Emma and Bessie, the Schuylkill, and the J. B. Blades,—in the order named, were in tow of the Curtin, an ocean-going tug, en route from the port of Philadelphia to the port of

Norfolk; and about 7:40 p. m., at a point opposite Nottingham & Wrenn's Pier, on the eastern side of the Elizabeth river, and a little below and across from Hospital Point, the barge McIlvaine, being the barge next to the tow, in sheering out from the tow to take anchor in the anchorage ground on the eastern side of the channel, came into collision with the Baltimore Steam Packet Company's steamship the Alabama, then leaving its pier en route on its outward trip to Baltimore, and sustained serious damage. The contest is a triangular one, and many faults are alleged by the parties respectively against each other. The charges of the libelant against the steamer are, briefly: The failure to keep out of the way, the maintenance of an improper and excessive rate of speed, the fact of going to starboard instead of port, the failure to stop and reverse, and the lack of a competent master and lookout. And against the Curtin are: That it should have taken the barge safely to anchorage, without placing it in a dangerous position, and, if so placed, should have promptly extricated it; that it should have given the Alabama two whistles in time to have advised her of the situation of the tug and tow and the danger of her going to starboard, and that it also should have sounded its danger signal. The tug Curtin, denying the several faults alleged against it by the libelant, insists that the collision was solely the fault of the Alabama, and specifically charges against the said steamer that she failed to keep a proper lookout; that she was proceeding too fast; that she did not slow down, and stop and reverse; that she should have proceeded, under the circumstances, to port, instead of attempting to pass to starboard, and have gone more to starboard if intending to pass on that side of the channel; and that she failed to keep away from the barge, which, at the time of the collision, was moving only by its own momentum. The steamer Alabama, protesting its own freedom from fault, insists that the collision was the result of the joint carelessness of the McIlvaine and the Curtin, and that the former negligently allowed the latter to cast her loose in the nighttime, in a crowded harbor, across the track of vessels; that, having the Alabama on her starboard bow, she should have kept out of the way; that she was proceeding at an improper speed, without lawful lights properly set and burning, and was not manned by a competent and skillful crew. And against the Curtin particularly for casting the barge adrift; failing to carry the barge to her anchorage ground and properly anchor the same; placing the barge in a dangerous position and doing nothing to relieve her; the failure to respond to the steamer's signals, but, on the contrary, giving a cross signal; the failure to give danger signals, or otherwise acquaint the steamer with the situation; having an incompetent master; and recklessly and negligently monopolizing and blocking the entire channel at the worst time it could have selected for the purpose.

Edward R. Baird, Jr., for libelant.
Hughes & Little, for the Alabama.
Heath & Heath, for the Curtin.

WADDILL, District Judge (after stating the facts as above). A great mass of evidence was taken, the witnesses being examined in open court, and in many important particulars the contest is sharply drawn, and the conflict between them apparently irreconcilable. Indeed, the condition in this respect frequently arising in collision cases exists in an unusual degree; yet in many particulars it can be accounted for by the peculiar character of the accident, the fact that it occurred in a narrow channel, on a dark night,—all of them matters as to which persons most frequently differ. The witnesses, in the main, from their frankness of statement and manner of testifying, appeared to be giving an accurate account of the occurrences as they saw them, and many of them were disinterested. The matter most in dispute, and upon which the case will largely turn, is the location of the tug and tow

prior to and at the time of the collision, their claim being that they were on the eastern side of the channel of the Elizabeth river, having come up from Lambert's Point on that side, with a view of making the anchorage ground for the McIlvaine; whereas the Alabama claims that they were well to the westward side of the channel, and that, as it sprang out from its pier, a distance of some 1,200 feet or more away, it observed the line of red lights well off of its port bow, and thereupon sounded the usual passing signal, and proceeded on its course down the eastern side of the channel; and that, upon the failure of the Curtin to answer its passing signal, it slowed down, stopped and reversed, and turned on its search light, when it discovered the barge McIlvaine a short distance off of its port bow, moving immediately across the channel; that it put its engines full speed astern, and did everything possible to avert the collision, but without avail, the barge coming into collision with it on its port beam, while it was moving backwards. These two contentions present the peculiar coincidence of the steamer's insisting that the tug and tow were just where they should ordinarily have been in the channel, and the tug and tow maintaining that they were not there, but on the opposite side of the channel, immediately across the pathway of outgoing steamers. After giving to this evidence much consideration, I am convinced that the tug and tow were not on the western side of the channel, but on the eastern side, though possibly not so far over to the east as claimed. The eastern side of the channel is where it should have been to have properly placed at anchor the McIlvaine; and the uncontradicted evidence is that other shipping, including an ocean-going steamship, passed it on the western side of the channel coming up from Lambert's Point. The presence of a three-masted schooner anchored well into the channel off Nottingham & Wrenn's pier doubtless accounts for the tug and tow being further out into the channel than they otherwise would have been. The fact that the Alabama found her course along the usual pathway on the eastern side of the channel blocked by this tug and tow, and that it, too, upon extricating itself from the collision, starboarded, and proceeded down the western side of the channel, further satisfies me of the location of the tug and tow. The position of the Alabama as to the tug and tow being well to the western side of the channel is not borne out by the facts in the case, and, in order for the collision to have happened upon that theory, involves the fact of a barge, of its own momentum, moving across the channel against the tide, and proceeding at such speed as to collide with a steamer moving backwards. The steamer's confusion as to seeing the red lights, thought to be on the western side of the channel, can, doubtless, be accounted for by its springing out from the front of its piers heading itself rather across the channel, to the east, at a greater momentum than it anticipated, and its failure to shape its course down the channel as quickly as it should have done.

Having determined the location of the tug and tow, the question of negligence against the barge, the steamer, and the tug will be taken up, in the order named.

First. The only assignment of negligence against the barge for which it should be held responsible as between itself and the tug, as to which

there is any evidence, is that of the failure to have its lights properly set and burning. Upon that question there is some conflict in the testimony, but it largely preponderates in favor of the barge, and establishes that its lights were properly set and burning. This is shown by positive evidence of persons who were in a position to have seen and did see the lights, and is entitled to greater weight than that of mere negative witnesses, who say they did not observe the lights. The Thingvalla, 1 C. C. A. 87, 48 Fed. 764; The Michigan, 11 C. C. A. 187, 63 Fed. 280; Green v. Compagnia Generale, etc., 42 C. C. A. 580, 102 Fed. 650. Moreover, it should not be readily inferred that this barge, then in command of its owner, would have been guilty of the gross negligence of navigating without its lights, which would have been of such serious consequences to it. The Gate City (D. C.) 90 Fed. 314, 317.

Second. It will not be necessary to pass upon all the various faults alleged against the steamer by the tug and tow, respectively, but rather to deal generally with them. The tug and tow occupied the position of an incumbered vessel, and a duty was imposed upon the steamer, having full control of its own movements, to keep out of the way, and, if need be, to stop and reverse its engines; and this obligation was the more incumbent as the steamer itself, only a few minutes before the collision, was standing lashed to its own pier. The obligation upon it was a positive one, and no risks or hazards should have been taken as to its course; and for any error in this regard it is clearly liable. The Syracuse, 9 Wall. 672, 675, 19 L. Ed. 783; The Mayumba (D. C.) 21 Fed. 476; The B. B. Saunders (C. C.) 25 Fed. 727; The Aller, 20 C. C. A. 79, 73 Fed. 875; The Lucy, 20 C. C. A. 660, 74 Fed. 572; The New York, 175 U. S. 187, 207, 20 Sup. Ct. 67, 44 L. Ed. 126. The steamer's conduct, under the circumstances of this case, according to her own theory, could only be justified, if at all, by the exercise of extreme care on her own part, when it is remembered that she was mistaken in supposing that the pathway was clear down the eastern side of the channel, and that, on the contrary, before she had proceeded four lengths of the steamer from her pier, she became entangled with the tug and tow. By the exercise of proper care on her part, she could easily have seen the blocked condition of the channel just ahead of her before or at the time she left the pier; and upon having observed, as she admits she did, the lights ahead, indicating the presence of a tug and tow, and having signaled the same, she should not have approached it in such close proximity as not to have been able to avoid colliding with it. Her stopping and reversing her engines did not take place in time to avert the collision, as it manifestly would have done with a tug standing still and a barge moving only with its own momentum and against the tide. The cross signals given by the tug, and alleged as one of the faults against it by the steamer, do not appear to have affected the collision, so far as the steamer was concerned; for, while the libelant's evidence and that of the tug tends strongly to show that these signals were given in time to have enabled the steamer to avoid the collision by going to port and passing down the western side of the channel, still the steamer's contention is that the vessels were practically in collision when the signals were given. Upon the assumption

that these signals should have been given earlier, or that danger signals should have been sounded, in either event the steamer would not be excused for leaving its wharf, and moving out into a blocked channel, only a few hundred yards away from it, at such speed as to be unable to control its own movements.

Third. Coming to the faults assigned against the tug Curtin. Being in charge of a tow, it occupied, as before stated, the position of an incumbered vessel, and as to many matters would be relieved of liability. Still this did not relieve it from all responsibility, or from the exercise of that care and caution that a due regard of the rights of others required. It was navigating a narrow and a much frequented channel, on a dark night, at the time that it was known that the outgoing steamers usually passed; and having elected to take the eastern, instead of the western, side of the channel from Lambert's Point up to Norfolk, which placed it in the direct pathway of outgoing vessels, it should have exercised extraordinary care in bringing in a tow of the length and character of the one in question. The Mary McWilliams (D. C.) 47 Fed. 333; The Plover (D. C.) 100 Fed. 883. The law imposed upon the tug the duty to exercise reasonable care and caution and maritime skill in everything relating to the safe anchorage of the barge until the work in hand was accomplished, and for any negligence on its part in this regard it was liable to those sustaining injury thereby. The Syracuse, 12 Wall. 167, 20 L. Ed. 382; The Margaret, 94 U. S. 494, 24 L. Ed. 146; The James Jackson (D. C.) 9 Fed. 614; The Annie Williams (D. C.) 20 Fed. 867. Upon reaching Nottingham & Wrenn's wharf, and finding its pathway in part obstructed by an anchored vessel, which necessarily threw it further to mid-channel, the tug ought not to have attempted at that place, under such circumstances, to have still further obstructed the channel by sheering the barge of its tow in collision out to anchor as it did. This conduct on its part monopolized more of the fairway of the channel than was reasonable, and at least imposed upon it (assuming that room enough, at that particular time, was left for the outgoing shipping to pass to port, and down the western side of the channel, instead of to starboard) the obligation to take every possible precaution, and, if need be, to give danger signals, upon the steamer's approaching it, in order to avoid injury to others.

It follows from what has been said that the barge McIlvaine was free from fault, and that the collision was the result of the joint negligence of the steamship Alabama and the tug Curtin; and a decree may be accordingly so entered, dividing the damages between them, with costs against the tug and steamer.