## THE BRINTON.

### THE WILKESBARRE.

### ULRICH *v.* THE BRINTON AND THE WILKESBARRE.

*(District Court, S. D. New York. May 4, 1892.)*

1. **COLLISION—NARROW CHANNEL—SWINGING TOW—FAILURE TO REVERSE IN TIME.**
   A tug and tow and a steamboat attempted to pass each other in the Kill von Kull, in a channel 1,000 to 1,100 feet wide, and exchanged a signal of one whistle. The evidence showed that the tail of the tow, which was going with the tide, had swung at the time of collision nearly three fourths of the distance across the channel; also that the steamboat did not reverse, because not thought necessary, although the swinging of the tow was apparent. *Held,* that the collision was due to the fault of both steamers.

2. **SAME—DAMAGES—PERSONAL INJURY—NOT PROXIMATE RESULT.**
   A boatman, who is not struck or thrown into the water by the blow of a collision, but of his own volition remains aboard the disabled boat after collision, his health suffering in consequence of the exposure, cannot charge his personal injury as an item of the damages occasioned by the collision.

In Admiralty. Libel by Napoleon B. Ulrich against the steamtug Brinton and the steamer Wilkesbarre for collision. Decree for libelant against both vessels.

*Hyland & Zabriskie,* for libelant.
*Robinson, Bright, Biddle & Ward,* for the Brinton.
*Wing, Shoudy & Putnam,* for the Wilkesbarre.

BROWN, District Judge. On the 15th of December, 1891, about daybreak, as the steamtug Brinton was taking a tow of light canal boats, consisting of four tiers, with four boats in each tier, on a hawser of 20 fathoms, to the westward through the Kill von Kull in a strong flood tide, the tail of the tow, when in the vicinity of the plaster works at New

Brighton, came in collision with the steamer Wilkesbarre, loaded with 2,000 tons of coal, bound eastward out of the Kills. The libelant's boat was so much damaged as to become a total loss.

The width of the channel way at the point of collision was between 1,000 and 1,100 feet. The witnesses for the Wilkesbarre testify that at the time of the collision she was close to the Staten island shore, and as near as it was possible for her to go; while the witnesses for the Brinton testify that the tug was within 50 feet of the Bayonne oil dock opposite, and that the end of the tow did not extend more than 250 or 300 feet from the New Jersey shore. If the latter contention were even approximately correct, the sole responsibility of the Wilkesbarre would be clear; for the two boats exchanged a signal of one whistle when about 3,000 feet apart, and it was the duty of each to go to the right; and there was nothing to prevent the Wilkesbarre from keeping well on her own side of the channel.

1. In the conflict of testimony on this point, not only the evidence of the libelant, a disinterested witness, but the drift of his boat after collision, satisfies me that the contention of the Wilkesbarre is substantially correct; and that she and the tail of the tow at the time of the collision were nearly three fourths of the distance towards the Staten island shore, and within 300 feet of it. For the libelant's boat, having been broken loose by the collision, drifted up with the flood tide so as to go not more than 100 or 200 feet off from the dock at Sailors Snug Harbor. A line was got out in order to make her fast there; but she drifted on beyond. The evidence shows that the set of the flood tide there was nearly true, not setting inwards more than 50 feet between the place of collision and the Snug Harbor dock; so that the tail of the tow at collision must have been about three quarters of the distance towards the Staten island side. It is not contended that this was necessary for the navigation of the tow, and it manifestly was not. For this I must hold the Brinton in fault.

2. The Wilkesbarre is in fault for not reversing as she might and ought to have done. The approach of the tow was seen in ample time. No circumstances are mentioned by the master that are sufficient to excuse this omission. The steamer was perfectly manageable; and the only reason finally stated by her master for not reversing is, that until just before the moment of collision he thought the tow would go clear without his reversing. But it was palpable from the position and movement of the tow that the tow was on a swing through the effect of the wind, the tide, and the tug's port helm. The rules of navigation required the steamer to reverse; the master relied upon the calculation of a close shave, instead of obeying the rule, and he must abide by the consequences of his miscalculation.

3. The claim for personal injuries should, I think, be disallowed, as not resulting directly and naturally from the collision itself, but from the libelant's own volition, as a new agency, in remaining upon his boat some two hours or more after the collision. *Railroad Co.* v. *Reeves*, 10 Wall. 176; *Railroad Co.* v. *Kellogg*, 94 U. S. 469. During this in-

terval he was more or less in water, moving around upon his boat in December weather; and, as he claims, he suffered considerable injury to his health in consequence. From the collision itself, the libelant received no personal injury; that is, he was not touched by the blow, nor thrown into the water. *The Queen*, 40 Fed. Rep. 694. He had the opportunity of going ashore, if he wished, in a small boat which came alongside. He remained on board his own boat, by his own choice. This was for the purpose, no doubt, of looking after his property; but it was none the less by his own volition, as a new agency, and not by any constraint of the other vessels. His health suffered from his own voluntary exposure. Of the propriety of this exposure he alone had the means of judging.

Whether this exposure was in fact more or less than that to which boatmen are accustomed, does not appear. It was his risk, and not the steamer's. While it is the duty of an owner to take reasonable care of his property to prevent its becoming a total loss, he is not under any legal obligation to endanger his life or health for that purpose. The evidence, moreover, does not show the particulars as to the extent of the exposure, or the necessity of it. What the libelant did was apparently of no service to the boat. He might as well have gone ashore at Sailors Snug Harbor, where he at first proposed to take the boat, but where he afterwards told the men to cast off the lines. Whatever he voluntarily did in this way, places him, I think, in no different relation to the steamers from that of any employe whom he might have obtained to render the same service. Each is the judge of what he may properly undertake; and if the result be unfortunate, he cannot go back to the original wrongdoer for indemnity. Such a consequence is too remote and uncertain, and is dependent upon too many intervening circumstances, to be regarded as the direct, or necessary, or natural result of the original wrong.

Decree for the libelant against both vessels, with costs, with an order of reference to compute the damages, if not agreed upon.