## THE JAMESTOWN.

### THE NORFOLK.

(District Court, E. D. Virginia. February 18, 1902.)

1. COLLISION—STEAMSHIP AND TUG WITH TOW—PRESUMPTION OF FAULT.

   A tug with a vessel in tow occupies the position of an encumbered vessel, and it is the duty of a steamship approaching it, unencumbered, to keep out of the way. Its action, under any circumstances, should be on the safe side, taking no chance of collision which can be avoided, and it will be presumed to have been in fault for a collision unless fault of the tug or tow is shown.

2. SAME—DUTY OF TUG WITH TOW—NAVIGATING CHANNEL.

   While a tug with a tow has the right of way over an unencumbered vessel, it has no right to unduly or unnecessarily obstruct the pathway of other vessels, and in navigating a channel known to be constantly used by other vessels it is its duty to take all proper and reasonable measures to have its tow under control, and to lessen the danger of collisions.

3. SAME—EVIDENCE CONSIDERED.

   A large steel barge, laden with freight cars, while passing up the Elizabeth river to Norfolk at about 5 in the evening, in tow of an ocean tug came into collision with the steamship Jamestown, which was passing down. The barge was on a hawser of 70 to 100 fathoms, the tide was flood, and a gale from the northwest made it difficult to control the tow, so that the two vessels occupied the greater part of the channel. This fact was known, or should have been, to the Jamestown, which saw the tug and tow when 2½ mile away, but kept its speed of 14 or 15 miles an hour until opposite the tug, when its effort to avoid collision by stopping and reversing came too late. Held, that both the steamship and the tug and tow were in fault, the former for approaching at too high a speed and failing to stop before there was danger of collision, and the latter because it was negligence, under the circumstances, to enter the channel, at a time of day when outgoing steamers were known to be coming down, without shortening the hawser, or taking other measures to bring the barge under closer control, she having been to the east of the center of the channel at the time of collision

In Admiralty. Libel and cross libel for collision.

Thomas H. Willcox and Whitehurst & Hughes, for the barge.

Frank D. Sturgiss and Hughes & Little, for the Jamestown.

WADDILL, District Judge. This is the case of a libel and cross libel arising out of a collision between the Old Dominion Steamship Company's ship the Jamestown and Barge No. 5 of the New York, Philadelphia & Norfolk Railroad Company, on the evening of February 8, 1899, in the Elizabeth river, between Boush's Bluff and Sewell's Point, the barge, in tow of the tug Norfolk, coming up the river, on her way from Cape Charles to Port Norfolk, and the steamer going down, on her way from Norfolk to Newport News. The tide at the time was flood, with a heavy northwesterly gale prevailing.

The charges of fault alleged against the Jamestown are: (1) That she was proceeding at too rapid a rate of speed; (2) that she did not have a proper lookout; (3) that she changed her course from the eastern side of the channel; and (4) that she did not stop and reverse in time.

The charges against the tug and tow are: (1) That they were wrongly navigating on the east side of the channel; (2) that they did not obey the law, and go to the right; and, (3) as one reason for their omission to obey the law, that the barge could not be properly handled, because of the undue length of the hawser by which she was being towed.

The evidence, as viewed by the court in this case, establishes quite clearly two facts, one of which is most earnestly contested by the libelant, and the other by the respondent, viz.: First, that the tug and tow, at the time of the collision, as they had been for some time prior thereto, were occupying practically the whole channel, and certainly that the stern of the barge was considerably east of the midway of the channel; and, second, that this position of the tug and tow ought to have been seen and was observed by the navigators of the Jamestown a sufficient length of time ahead to have avoided the collision by the exercise of proper care on their part.

It is necessary to ascertain the liability of the parties, respectively, in the collision with these two facts established. The tug with the tow occupied the position of an encumbered vessel, and the Jamestown was free, and, under the circumstances, should have been navigated with caution; and, unless it appears that the encumbered vessel was at fault, it will be presumed that the collision was the result of the Jamestown's negligence. An unencumbered vessel approaching a tug with tow should keep out of the way. The Mayumba (D. C.) 21 Fed. 476; The B. B. Saunders (C. C.) 25 Fed. 727; The Lucy, 20 C. C. A. 660, 74 Fed. 572; Spencer, Mar. Coll., 264, 275, 276.

In The Syracuse, 9 Wall. 672, 675, 19 L. Ed. 783, 784, Mr. Justice Swayne, speaking for the supreme court, said:

"A tug with a vessel in tow is in a very different position from one unencumbered. She is not mistress of her motions. She cannot advance, retreat, or turn either way at discretion. She is bound to consult their safety as well as her own. She must see that what clears her of danger does not put them in peril. For many purposes it may be regarded as a part of herself. They have the benefit of her traction, and she the burden of their inertia."

The tug Norfolk was a large ocean-going tug, and had in tow a steel barge of large dimensions, loaded with 28 freight cars, with a hawser variously estimated from 70 to 100 fathoms in length, and was at the time of collision ascending the Elizabeth river, with a flood tide, and a strong northwesterly wind prevailing, which tended to make the barge trail across the channel, and made the control of the tow a matter of more or less difficulty. The steamship, under these circumstances, was descending the river, with wind and tide against it, which enabled it more easily to control its movements. The Galatea, 92 U. S. 439, 23 L. Ed. 727; The Henry Clay (D. C.) 72 Fed. 1021.

While the libelant insists that the tug and tow were to the westward side of mid-channel, and that the tug was well to the westward side at the time Sewell's Point was passed, a distance of some mile and three quarters below the scene of collision, which was agreed to be about 3,600 feet below, or north, of Boush's Bluff, still the evidence

does not sustain, in my judgment, this contention of the libelant, certainly as to the position of the tug and tow when the collision occurred, though the tug may have been in the position claimed for it at the time it passed Sewell's Point. The navigators of the steamship admit having observed the tug and tow after passing Lambert's Point, and from thence for a distance of some 2½ miles, and that they slowed down while making the turn at the piers at Lambert's Point, and thence straightened out on the course down to Boush's Bluff lightship, there made a close haul to the eastward, and proceeded, according to their testimony, down the eastern side of the channel of the Elizabeth river, under one bell, until within a short distance of the scene of the collision, when the steamer, under her port helm, applied for the purpose of passing to the eastward of the barge, "smelt bottom," and took a sudden sheer, coming into collision with the barge, and that the steamer at that time stopped and reversed, and did all in its power to avert the disaster. The libelant's contention, on the other hand, is that the Jamestown ran at a high rate of speed, from 14 to 15 miles an hour, from Craney Island down until when, abreast of the tug, it slackened its speed, and attempted to stop and reverse, but too late to avoid the collision. The evidence tends strongly to support the position taken by the tug and tow as to the speed of the steamer, when it attempted to stop and reverse, and at least establishes the fact of the steamer's failure to take the proper precautions to avoid collision with the tug and tow, then virtually across its pathway. Indeed, it seems quite evident that, until practically in collision, the steamer proceeded upon the theory that it could pass clear of the barge with safety.

There was nothing in the existing conditions to prevent the steamship's keeping out of the way of the tug and tow; and having seen the same the distance it admits it was observed, at that hour of the evening, about dark, knowing that the tow was moving with the wind and tide, it should have exercised a greater degree of care and caution than it did in approaching the tow. Any error should have been on the safe side. It was not enough to have so acted or changed its course as possibly, or even probably, to have avoided a collision. No such chances need or should have been taken. The Wilkesbarre (D. C.) 50 Fed. 582; The Chatham, 3 C. C. A. 161, 52 Fed. 396, 399; The Owego (D. C.) 71 Fed. 537; Mars. Mar. Coll. 377.

Coming to the faults alleged against the tug and tow, while it seems quite evident that the Jamestown should have exercised a greater degree of care to avert the collision than it did, it cannot be said that the tow was free from fault, and that its neglect did not, in part, bring about the collision. For a distance of some two miles during the hour of the evening that steamers leave Norfolk on their outward trips practically the entire channel was taken up by this tug and tow, and, while other steamers passed it further down the channel with safety, one barely escaped having the same misfortune overtake it that befell the Jamestown. The condition of the wind and tide was well known to those in charge of the tug and tow, and there was no difficulty in so managing the same as to prevent the obstruction of the entire fair-

way to others entitled to the like right. The tug was admitted to be sufficiently powerful to have carried two barges like the one in tow; and if the hawser as used, whether 70 or 100 fathoms, was too long to keep the barge, under the then existing conditions of the weather, under proper management and control, it could easily have been shortened, and should have been. While it is true that the tug and tow occupied the position of an encumbered vessel, and to that extent had the right of way, still corresponding obligations rested upon it, not unduly and unnecessarily to obstruct the pathway of commerce, as it did on this occasion, and particularly in this narrow, busy, and much frequented channel. The Mary McWilliams (D. C.) 47 Fed. 333; The Plover (D. C.) 100 Fed. 883.

Counsel for libelant has made reference to the case of The Westhall, recently decided by this court, and unreported, as sustaining the contention made in behalf of the tug and tow on this occasion. A careful examination of that decision will fail to show anything inconsistent with the views herein expressed. In that case the tug, with several barges in tow, on passing down the eastern side of the channel of the Elizabeth river, crossed to the western side, with a view of proceeding to an anchorage ground, and in so doing the steamship, in broad daylight, passing up the western side of the channel, came into collision with the rear barge in tow, the tug and other barges having passed out of the channel. No excuse could properly have been made for this conduct on the part of the steamer, as the position of the tug and tow was obvious, and only one barge was in the track of the steamer, with ample room for it to have passed clear on the other side and avoided the collision.

It follows from what has been said that both the steamship and tug and tow were at fault in the collision, and as a result the damage caused thereby should be divided, and a decree may be accordingly so entered.