## THE TAURUS.

(District Court, D. Delaware.　March 4, 1907.)

### No. 696.

COLLISION—EVIDENCE—MUTUAL FAULT.

A collision having occurred between a naphtha launch proceeding up the Christiana river on the right side, and a tug, with a barge in tow, proceeding down the river on the same side, *held*, that the tug was at fault for being on the wrong side of the river, and for not seasonably signaling, and the launch in fault for stubbornly holding her course after learning that the tug had a tow and that a collision would be inevitable, unless the launch changed her course.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, §§ 52, 73–77, 187–192.

Signals of meeting vessels, see note to The New York, 30 C. C. A. 630.]

(Syllabus by the Court.)

In Admiralty.

Horace G. Knowles, for libelants.

William S. Hilles, for respondent.

BRADFORD, District Judge.　Charles P. A. Bright and William M. Bright as owners of the screw naphtha launch Ralph W. have libeled the steam tug Taurus to recover damages for injury sustained by the launch through a collision with the tug in the Christiana River in this district October 4, 1904, between ten and eleven o'clock at night. Just before giving the single blast hereinafter referred to the launch was coming up the river at a distance of between one third and one half a mile from and below the draw-bridge of the Philadelphia, Baltimore and Washington Railroad Company, and the tug was proceeding down the river having a barge in tow.　The collision caused the launch to sink with its cargo and to suffer other damage.　The libel alleges in substance, among other things, that the launch prior to the collision was coming up the river in a proper manner and gave "due and proper signal" to the tug to go to starboard or toward the southerly side of the river; that the tug gave no answer to the signal; that its engines were not stopped in due time to check its headway, nor was its course properly directed; that the tug was improperly and unskillfully managed and navigated; that when the tug was at the distance of about 100 feet from the launch the former vessel "without warning, suddenly and contrary to signal changed her course," heading across the river toward its northerly side and across the bow of the launch, towing or swinging the barge around and causing it to strike with great force against the bow of the launch; and that the collision was wholly due to the negligence and want of proper skill on the part of the tug.　The answer of the owner of the tug denies that the launch was prior to the collision coming up the river in a proper manner; and alleges in substance that the tug with its tow was "being navigated and directed in a careful and prudent manner," and with proper lights; that the tug after passing through the draw-bridge was proceeding down the river a little to the northeastward of the centre of the channel; that the launch was coming up the river to the southwestward

of the centre of the channel in a course which, if held, would have avoided a collision; that when the launch was about 100 feet from the tug the former vessel suddenly changed its course, at the same time giving "one blow with a horn"; that the persons in charge of the tug had no knowledge or intimation that the launch intended so to change its course; that the tug seeing it was impossible for the launch to cross its bow immediately blew two whistles and called to the launch not to attempt so to cross; that the tug immediately thereafter again blew two whistles and slowed its engine; that the launch, nevertheless. collided with the barge in tow of the tug; that at the time of the collision the engines of the launch were running and that vessel made no effort to avoid the collision, but recklessly and carelessly ran into the barge; and that the launch at the time of striking the barge was going across the river in a direction at right angles to its former course and that of the tug and barge. The answer also denies all material allegations in the libel directly bearing on the question of fault as to the collision.

The evidence is somewhat voluminous, and much of it, as is usual in cases of collision, is contradictory and unsatisfactory. I have found it necessary carefully to consider most of the testimony in the light of the undisputed or clearly established facts and the probabilities in order to ascertain the weight to which it is entitled. Some of the evidence in which points of the compass are mentioned is somewhat confusing, owing to the fact that several compass directions are expressed indifferently with respect to the same thing. It may avoid misapprehension to state that whenever a side of the river or of its channel is referred to as northerly, easterly or northeasterly, the left hand side as one faces down stream is meant; and so whenever reference is made to the southerly, westerly or southwesterly side, the right hand side as one so faces is meant. Articles 25 and 27 of the sailing regulations for inland waters of the United States (Act June 7, 1897, c. 4, 30 Stat. 101, 102 [U. S. Comp. St. 1901, pp. 2883, 2884]), are as follows:

"Art. 25. In narrow channels every steam-vessel shall, when it is safe and practicable, keep to that side of the fair-way or mid-channel which lies on the starboard side of such vessel.

"Art. 27. In obeying and construing these rules due regard shall be had to all dangers of navigation and collision, and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger."

It clearly appears that the tug did not keep to that side of the mid-channel which lay to starboard, when below the draw-bridge and while approaching the launch. The answer admits that "after passing through the railroad draw-bridge the said tug, with her tow * * * were going down the Christiana River a little to the eastward or northeastward of the centre of the channel," and the evidence on both sides abundantly establishes the fact. The tug thus pursued a course on the side of the mid-channel lying to port, in violation of article 25, unless it was unsafe or impracticable to keep to the side of the mid-channel lying to starboard, or the dangers of navigation or collision or special circumstances required a departure from the course specified in the article. But the evidence wholly fails to disclose any such element of

unsafety, impracticability, danger or special circumstances. It does not appear that there was any stress of wind or water, or any obstacle to the safe navigation by the tug with its tow of any portion of the channel, or any other consideration requiring, justifying or excusing a departure from the usual course prescribed by law. Nor does the answer assign any reason why the tug proceeded down the river on the port and not the starboard side of mid-channel. Under these circumstances and in view of the fact that the collision occurred on the port side of mid-channel there is at the outset a prima facie presumption of fault on the part of the tug. It is, however, contended by the claimant that the launch in coming up the river and while nearing the tug did not keep on the side of mid-channel which lay to starboard of the former vessel; that the course of the launch was on the southerly side of mid-channel; that it would not have been practicable or safe for the tug to cross to the other side of the river to avoid the launch; that if the latter vessel had held its course no collision would have occurred; and that the collision was caused by a sudden and wholly unnecessary change by the launch of its course to starboard or toward the northerly side of the river. This contention is not supported by a preponderance of the evidence. On the contrary it is refuted not only by the direct testimony of witnesses but by the gross improbabilities involved in it. It is important at the outset to ascertain the position of the launch and the tug in the river and their courses and bearing immediately preceding the giving of the single blast by the former vessel. The witness Davis, captain of the tug, states in effect that at that time the tug with its tow was proceeding down the river parallel to and on the northerly or port side of mid-channel and about 60 or 70 feet from the northerly side of the channel, the channel there being 250 feet wide, and the launch was proceeding up the river, showing only its starboard side light, and hugging the southerly side of the channel at the distance from that side of about 60 or 70 feet; that the launch was then distant from the tug about 125 or 150 feet; and that if the launch had continued to hold its course the collision would not have occurred. He further states in effect that the launch as soon as the single blast was given swung to starboard, crossed from the southerly to the northerly side of the channel still swinging to starboard, and ran head on against the starboard side of the barge at a point about 20 feet from its bow; the launch at the instant of collision heading in a direction at right angles with its former course and the line of mid-channel. With respect to this testimony of the captain of the tug several things properly may and should be said. First, on its face, while it is possible, it is extremely improbable that it is correct. The evidence shows, and it is not disputed, that the tug, the barge and the launch carried the lights required by law, and the captain of the launch testifies to the effect that he knew at the time of giving the single blast that the tug had a tow. Under these circumstances and, according to the testimony of the captain of the tug, with a clearance between that vessel and the launch of about 100 feet, had the latter continued to hold her course, and, in the absence of any evidence suggestive of intoxication, lunacy or other incompetency on the part of the captain of the launch, it is, to say the least, highly improbable that

the launch should have executed the manœuvre attributed to it by the captain of the tug. Again: the statement by the captain of the tug of the position in the channel of the launch at and just prior to the time of the giving of the single blast is not corroborated by any witness in the case. Hopkins, the engineer of the tug, did not see the launch or know its position until the tug had slowed down after the giving of the single blast. The same is to be said of Davis, the fireman of the tug. Windal, the steward of the tug, did not see the launch until after the collision. The same is to be said of Blocksom, the mate of the Taurus, and of Jefferson, the captain of the barge. Such of the witnesses on the part of the claimant as saw the launch after the giving of the single blast and prior to the collision speak of the position and movements of the vessels when disaster was immediately impending and unavoidable, and after the swinging of the launch to starboard and of the tug and its tow to port in such manner as at night and in the excitement of the moment to beget confusion as between the courses of the vessels with respect to the line of the channel and the angle of intersection of such courses. Further, aside from its inherent improbability, the correctness of the statement of the captain of the tug is negatived by a clear preponderance of the evidence. Bright, the master of the launch, testifies to the effect that at and prior to the giving of the single blast the launch was proceeding up the river on the northerly side of the channel and that when that blast was given the tug was "coming direct at me" with its red and green lights both visible. Penington, a deck hand on the launch, testifies to the effect that when the single blast was given "the Taurus was making down with her lights bearing on us and that means they were both coming head towards each other," and that he then saw both the green and red lights of the tug. Bright, a son of the master of the launch, who was engaged as engineer in running it, testifies to the effect that at the time the single blast was given the tug and the launch "were running right direct at one another, lights shining." It thus clearly appears from the evidence that before and at the time of the giving of the single blast the launch was pursuing its course up the northerly side of the channel where it had a right to be, and the tug with its tow was pursuing its course down the same side of the channel where it had no right to be; and that when the blast was given the tug and launch were approaching each other end on in such manner as to involve risk, and, indeed, certainty, of collision, should both continue without change of course. As between an incumbered vessel and one which is unincumbered, the general rule is that the former is privileged to hold her course and the latter must keep out of her way. The Mayumba (D. C.) 21 Fed. 476; The Syracuse, 9 Wall. 672, 19 L. Ed. 783; The Lucy, 74 Fed. 572, 20 C. C. A. 660; The Jamestown (D. C.) 114 Fed. 593; The Alabama (D. C.) 114 Fed. 214; Mitchell Transp. Co. v. Green, 120 Fed. 49, 56 C. C. A. 455. But the fact that the tug was towing a barge did not confer a privilege on the former vessel to pursue a course on the port side of the channel in violation of article 25 of the sailing regulations. And being on the wrong side, it was especially incumbent on the tug to observe great vigilance and care to avoid collision. There is conflict in the testimony as to the dis-

tance of the launch from the tug, when the single blast was given. The captain of the tug, as before stated, testifies that at that time the two vessels were 125 or 150 feet apart. The master of the launch testifies that the vessels were then distant from each other, he should suppose, about 500 or 600 feet. Penington in his testimony places the distance at "about one hundred yards, more or less." Bright, the engineer of the launch, states that the vessels were about 50 or 75 yards from each other. None of the other witnesses testify on this subject. An average of the above estimates of distance would place the tug and the launch from 270 to 320 feet from each other when the single blast was given, and this probably is not far from the fact. But whether this be a slight overestimate or a slight understatement of the distance is unimportant in view of the other facts in the case. The tug and the launch for some time prior to the single blast were approaching each other end on, and if the tug intended, in violation of article 25, to continue its course on the northerly side of the channel, it was under an obligation not to be guilty of any act or omission calculated to confuse or mislead those navigating the launch with respect to such intention. The captain of the tug had no right to assume that those on the launch would believe that the tug, while having ample opportunity to direct its course to starboard and pass in safety with its tow to the proper side of the channel, would persist in its wrongdoing without at least giving by way of signal some intimation of its purpose. Under the circumstances it was peculiarly incumbent on the tug to give to the launch seasonable notice of the course it intended to pursue. This the tug did not do. It did not signal the launch until after the latter had given the single blast, if, indeed, it gave any signal at all to the launch, which on the evidence is somewhat doubtful, but unnecessary to decide. Further, it was the duty of the tug prior to the single blast and before a collision was imminent or seriously threatened seasonably to abandon its illegal course and proceed with its tow to the southerly side of the channel, and the tug was in fault for not so doing. Again: when the single blast was given it was understood by the captain of the tug. He admits that he heard it distinctly and knew what it meant. He then was aware that the launch was going to starboard, toward the northerly side of the river, and that the tug was notified by the launch to direct its course toward the southerly side of the river. The tug neither went to starboard as signaled nor held its course, but went to port; thus swinging with its tow toward the northerly side of the river and the place of collision. If the tug promptly on being signaled by the launch had directed its course to starboard, I have no substantial doubt on the evidence that the collision would have been avoided. Or if the tug had, notwithstanding the signal from the launch, continued to hold its course, I am on the evidence strongly inclined to believe that no collision would have occurred. That the tug, after hearing and understanding the single blast of the launch, should have disobeyed it and without stopping or attempting to stop and without even a danger signal, have directed its course to port, either with or without the giving of two blasts, betrayed a reckless disregard of the consequences which naturally might be expected to result to the launch as the smallest of the three vessels. The

only hypothesis on which the conduct of the tug could be justified or extenuated is that the launch without any inducement whatever and in full view of the tug and its tow left a place of perfect safety on the southerly side of the river and went across the channel and into the jaws of destruction. This hypothesis, however, as before indicated, must be rejected not only by reason of its utter improbability, but as opposed to a clear and decisive preponderance of the direct evidence. The more reasonable and, I have little doubt, the true explanation of the collision is that, when the tug and the launch were approaching each other end on, the former, although on the wrong side of the channel, was not willing unnecessarily to go with its tow to starboard in order to make way for what is recognized as a comparatively small and unincumbered craft, and negligently omitted until too late the observance of proper precautions against collision.

The question remains whether or not the launch was also in fault. It is not disputed that from the time the tug with its tow passed through the draw-bridge until the collision the lights of the vessels were visible to each other; and it clearly appears from the evidence that when the tug and the launch were approaching each other end on and were, as before stated, probably from 270 to 320 feet apart, the launch gave a single blast and immediately proceeded to starboard, and the tug practically at the same moment starboarded its helm and went to port; the vessels thus nearing each other on converging and intersecting courses, with the result that the tug crossed the bow of the launch, and the latter vessel and the barge collided. The master of the launch in describing the circumstances under which the vessels approached each other and came together, among other things, testifies:

"Q. 32. What did you do after she got through the draw? A. I stood there with my one hand on the wheel and the other hand I had my horn in, waiting for her to blow. I have always made it a practice to do that with all large boats. I wait until I get a signal from them so as to give them whichever side they want, because I know they draw more water than I do, and I can run nearer the shore than they can. Q. 33. Did she give you any signal? A. She did not. Q. 34. What did you do? A. I waited until I thought she was near enough. Then seeing that she wasn't going to blow, I blew to her, but she didn't answer me. As soon as I blew I turned my wheel to port and run my boat to the starboard. If he had held his course I would have cleared her. I could have cleared her on either side if he had told me which way he wanted to go. * * * Q. 37. What did she do after you blew your horn? A. She kept bearing off to the same side of the creek I was going on until she got close to me, then she cut across my bow and came down across the other side of me. That threw the barge quartering around, and it came quartering at me. As soon as I saw she wasn't going to let me get on that side, I told the men, 'Men, we are in a collision. Look out for yourselves.' I gave my man the bell, and he had her on the back gear running back when the barge fetched up into me. * * * Q. 82. At the time you saw the Taurus crossing your bow, did you make any efforts to avert a collision, and if so, just state what? A. Yes, sir. After she started to cross my bow, I saw I couldn't get on the starboard side where the law told me to go, and so I gave the boy the bell to put her on the back gear immediately. He had her on the back gear by the time I got done pulling the bell. * * * X 158. In relation to you, which way was the Taurus headed when you blew the horn the first time? A. Coming direct at me. * * * X 160. What did he do when you blew the horn? A. He hauled off a little on the north side of the creek. * * * X 162. And that happened when you were about five or six hundred feet away? A. Somewheres about that distance. * * * X 184.

And you knew she had a tow? A. Yes, sir; I knew she had a tow. * * * X 190. When you gave that signal you put your wheel to port. Hard to port? A. No, sir; not hard to port. I put it to port. * * * X 204. You said when you gave your blow that he turned his wheel to starboard and went to port, too? A. I didn't say which way he turned his wheel. X 205. You said he changed his course? A. He did change his course, but some wheels turn one way and some turn another. X 206. He changed his course to the northern side of the creek? A. He did, yes, sir. * * * X 219. How far away from the boat were you when you reversed your gear? I don't know the exact distance. I was several feet away. I should judge twice the length of my boat, perhaps. X 220. Up to that time you kept your wheel hard to port? A. Yes, sir. X 221. Port and hard to port? A. Yes, sir. * * * X 225. Did the Taurus keep going towards the northern side of the creek all the time? A. Yes, sir; she did after she started that way. * * * X 236. Can't you give us any idea as to how far away from your bow the side of the Taurus was when she went by you? A. She was not very far. * * * She was somewheres in the neighborhood of seventy five feet, somewheres thereabouts, more or less. * * * X 254. Where was the Taurus in relation to your boat when you reversed your propeller? Had she passed by you? A. No, sir; she had not. She was crossing my bow, or very near across, when I reversed my propeller."

The witness Penington states that from the time the launch gave her single blast she bore to starboard—"when he blew the horn we sheered to the right." He further testifies:

"X 91. When did you slow down? A. Just before the collision. X 92. How far were you off the barge when your engine was going full speed ahead? A. It wasn't very far. * * * X 94. The length of your boat? A. It may have been very near the length of the tow line, I can't tell you positively; when the captain gave him the bells to go back on her he hollered and says, look out, there is going to be a collision. * * * X 102. How far were you from the barge when you slowed your engine down for the first time? A. I judge as near as I can, as far as from here to that building over there, more or less. X 103. Can't you give it to us in feet? A. I judge about twenty yards or twenty five. X 104. Then what happened, you say you gave her the bell to stop her? A. A bell to slow her down; one to stop her and two to go back on her."

Bright, the engineer of the launch testifies in part as follows:

"Q. 22. What course did you take when you blew the whistle? A. We held to our right. * * * Q. 27. How much did the tug clear you, how far from you? A. She wasn't very far. Q. 28. How far? A. I can't tell exactly. Q. 29. One yard or ten yards? A. I don't think she was over two or three yards. * * * Q. 41. What signals were given and what did you do? A. He gave me one bell to slow her and one bell to take the wheel off of her and he gave me two to come back on her, and I did it. Q. 42. How far were you from the Taurus when the first signal was given to you? A. I should judge about fifty yards. * * * X 80. Did he give the signal to slow as soon as the horn blew? A. No, sir, not exactly."

While for the reasons already given the tug was grossly at fault, I have been forced to the conclusion that the launch was not free from blame for the collision. It is true that the latter vessel was on the northerly side of the channel where the tug had no right to be, and it is further true that the tug immediately on hearing the single blast from the launch, if not considerably earlier, should have directed her course to the southerly side of the channel. But the unlawful and negligent conduct of the tug did not justify persistence by the launch in a manœuvre which, however proper under ordinary circumstances, was directly calculated to result in collision, nor the omission by the

launch of reasonable care and skill to avert disaster. The rules of navigation were adopted for the purpose of preventing and not of causing collisions; and, therefore, article 27 wisely provides that in obeying and construing them due regard shall be had to any special circumstances rendering a departure from them "necessary in order to avoid immediate danger." When the master of the launch gave the single blast and ported his helm he knew that the tug was incumbered with a tow and he further knew a moment later that the tug did not assent to the course proposed; for he saw it moving toward the northerly side of the channel. It was then evident that a continuance by the tug and the launch to hold their respective courses meant danger if not certainty of collision. Under these circumstances, matters then not being in extremis, the obvious duty of the launch was to give a danger signal and reverse her propeller, or, possibly, if practicable, to change her course to port in conformity with the manifested desire of the tug. The launch gave her signal to the tug either seasonably or unseasonably. If seasonably, there should have been no difficulty on the part of the launch, notwithstanding the fault of the tug, in avoiding a collision by changing her course or reversing. If unseasonably, danger signals and reversing should have been resorted to immediately on the tug's beginning to swing to port. But, instead of exercising ordinary precaution, the launch persisted in swinging to starboard and going at full speed until, according to the evidence on the part of the libelants, the tug was crossing or about to cross its bow, when the master gave the order to reverse and exclaimed, "Men, we are in a collision. Look out for yourselves." Having reached the conclusion that both the launch and the tug were at fault, an interlocutory decree will be made dividing damages and costs between them.