## THE MERIDA.

(District Court, W. D. New York. September 21, 1909.)

COLLISION (§ 95*)—STEAMER AND TOW—MUTUAL FAULT OF STEAMER AND TUG.
    A collision off the south entrance to Buffalo harbor and some 200 feet northward of the submerged extension to the west-northwest from the north end of the south breakwater, between the freight steamer Merida, coming in, and a dump scow in tow of the tug McNaughton, passing out, *held* due to the fault of both steamer and tug; the former being in fault for failing to go to port, after an agreement to pass starboard and starboard, sufficiently to permit the tug to safely navigate to keep her tow off the submerged crib, and the latter for not sooner signaling when the master found he did not have sufficient room, and for keeping too far to the south until compelled to alter her course to the north across the bows of the steamer.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 200–202; Dec. Dig. § 95.*]

In Admiralty. Suit for collision by the Buffalo Dredging Company, as owner of the dump scow No. 12, against the steamer Merida. Decree dividing damages.

Brown, Ely & Richards, for libelant.
Clinton & Clinton, for respondent.

HAZEL, District Judge. This action was brought by the libelant, Buffalo Dredging Company, to recover damages in the sum of $12,-593, sustained through a collision between its dump scow No. 12 and the large freight steamer Merida, which occurred off the south entrance to Buffalo harbor at about 2 o'clock in the afternoon of July 8, 1907. The scow, which was being towed by the tug McNaughton to the dumping ground out in the lake, was struck by the steamer on her port side and was sunk.

There are three breakwaters in the vicinity of the collision, located in such way as to form a gap or entrance from the lake to the dock of the Buffalo & Susquehanna Steel Company plant: The main breakwater, which extends north and south, and has at its southerly end a light, called "Bottle Light." Beyond the light is an open space, of about 600 feet in width; and then comes the Stony Point breakwater, which extends from the land in a northwesterly direction, having at its outer end a lighthouse. Commencing at the extreme end of the Stony Point breakwater is a submerged extension, running about 1,000 feet out into the lake in a west-northwesterly direction. About 50 feet off the terminus of the submerged breakwater there was a gas buoy, around which vessels proceeding in a westerly or southerly direction were obliged at the time of collision to navigate, as the submerged crib was incomplete, and was of various depths under the water, and boats could not pass over it. On the north side of the submerged pier, however, throughout its entire length, the water is deep enough for large vessels to safely navigate. About 400 feet outside the entrance to the gap between the main breakwater and the submerged crib, the available navigable water was about 1,000 feet wide and about 21 feet deep. At the time of collision the wind was blowing fresh from a southwesterly direction, and the waves were high in the gap, rolling at intervals over the main breakwater.

Libelant claims, and testimony has been given in support thereof, that the collision occurred about 200 feet east of the gas buoy, which was located about 50 feet north-northwest of the outer end of the submerged crib. Respondent sharply disputes that the boats came together the number of feet stated from the submerged crib, and contends that the place of collision was about 284 feet therefrom.

It is important to know the position of the vessels in the channel. The scow, which had no rudder, was taken in tow by the tug McNaughton inside the breakwater, and a tow line 200 feet long was made fast to her starboard corner. It is usual and customary in this port, in towing behind the breakwater, to use a short tow line on scows having no rudder, fastening it on the starboard end thereof, so as to insure the scow following in the wake of the tug; for, if towed differently, the water stirred up by the propeller would cause her to swerve from side to side. The respondent intimates that the scow was fastened to the tug in such a manner as to cause her to swerve toward the submerged pier; but it is proven by a number of expert witnesses, familiar with the usual and proper way of towing in the situation presented, that the tow line was not only of sufficient length, but properly fastened to the scow. It appears that the McNaughton was following another tugboat and mud scow, which was navigating 200 feet ahead, and at the time of the collision was turning around the gas buoy. Previously both tugs had blown signals, two blasts of their whistles, to the Merida, which was then about one-half to three-fourths of a mile out in the open lake, headed to the entrance to the harbor, and intending to go to the wharf adjacent to the steel plant. Each of the signals were answered; the Merida assenting to the proposal to pass on the starboard side of the tows. After receiving the assenting signal, the McNaughton steamed ahead at the rate of three

miles an hour and straightened in her course; the Merida meanwhile bearing down on her. The master of the tug blew three blasts of the whistle to indicate the necessity for the Merida to check her speed or stop, to allow the McNaughton to go around the gas buoy. To this signal the Merida responded with a similar signal, and then proceeded slowly towards the entrance to the harbor.

The tow at this time was closer to the submerged crib than it was usual or customary for tugs with scows to navigate, and as the scow sheered closer to keep from striking it the tug required more space to the northward than the steamer was giving her. When about 500 feet from the crib light, the tug, which was then under check, changed her course a little to north. She first steered a little to port, and then to starboard, to keep the scow from edging over onto the crib. She became apprehensive of danger, blew an alarm signal when the scow was approximately 150 feet away from the crib, and drew over to the right side, intending to hold the scow off. The Merida did not go to port, as she agreed to do, but kept on straight ahead, and, as there was immediate danger of collision, the tug opened her engine and went across her bow, which was then 200 feet away. Before the McNaughton could haul the scow clear, it was struck by the steamer, head on, a little forward on its port side. Just before the impact the tug, which was then off to starboard and at right angles to the steamer, signaled the scowmen to dump the scow; but, in spite of doing everything possible at this time to avoid the collision, it was inevitable. The scowmen leaped into the lake and were rescued, while the scow instantly sank in deep water.

The master of the Merida was a stranger to the harbor, and did not know of his proximity to the submerged crib. He had heard of it, but it is plainly established by the evidence that he did not appreciate its nearness to his course. He did not comprehend the reason why the McNaughton came so close to the course which he had elected to take, and failed utterly to appreciate the danger to the scow. To keep the scow from going on the submerged crib, owing to the current or swell setting in its direction, it was necessary for the tug to maneuver to starboard; but the proofs show that she was not left free to do so by the Merida. That Capt. Ott did not regard the submerged crib as a factor in his navigation is plain from the conversation between him and the master of the McNaughton directly after the scow was sunk. Testifying on this point, Capt. Green says:

"A. The Merida came up kind of close. I said to him: 'Captain, you can't get by here, because I can't get out of your way.' He says: 'Why?' I says: 'The tow line is on my wheel.' 'Well,' he says, 'can't I go around the other way, over around the buoy?' Q. What buoy? A. The red gas buoy. Said I: 'Why, no; they are building a breakwater there. There's only five, six, or seven feet of water along in there.' Said I: 'If I could get over there, I would have went out that way.' Says I: 'You can't get around that way. You have got to go around my boat.' Says he: 'Are there water for me to go around your boat?' Says I: 'Yes.' Says he: 'All right, if there is.' He says: 'When I am going by you, I'll give you a line—pull you out from there.'"

In view of the circumstances that the McNaughton proceeding, with tow in a heavy sea, was the privileged vessel, her maneuvering to starboard would undoubtedly have been thoroughly understood by the

Merida, had she possessed the requisite knowledge of the obstructing crib to enable her skillful and careful navigation through the entrance to the harbor. Her master did not sufficiently alter her course to port after receiving the two-blast signal. He in effect testified, as did also the wheelsman, that the Merida starboarded her helm, which would have taken her to the northward; but I think the situation of the vessel at the time of the collision clearly contradicts him. The witnesses for the Merida are positive in their assertions that the steamer was headed between the middle of the entrance and the Bottle Light; but most of them are uncertain as to whether she steered to port after passing signals were exchanged, or that she appreciably went northward.

The contention of counsel for the Merida is that the McNaughton was proceeding too close to the submerged crib and that the scow came under the influence of the eddy which made it necessary for the tug to suddenly pull to starboard; that directly after executing this movement her master, perceiving the danger, blew an alarm, and, becoming excited, he went strongly to starboard and across the bow of the Merida. This view, however, is not supported by the evidence, and I therefore reject the contention. The proofs are that the Merida did not allow enough room in the channel to permit the McNaughton to properly handle her tow. It was her duty to give the tug such room as she could with safety to herself, as it was navigating in a peculiar situation under apparent difficulties. The Mayumba (D. C.) 21 Fed. 476; The Jamestown (D. C.) 114 Fed. 593; The Alabama (D. C.) 114 Fed. 214; Mitchell Trans. Co. v. Green, 120 Fed. 49, 56 C. C. A. 455. It was necessary for the tug to have a lateral distance of 150 feet in towing straight ahead from the side of the scow, and I believe the Merida was less than 225 feet from the crib, too far to the southward. This I deem to be fairly established by the testimony of the witness De Grasse, who was on the lighthouse on the Stony Point breakwater, and in an excellent position to judge of the distance between the submerged crib and the steamer.

Accordingly the Merida was in fault for not giving way to port under the agreement to pass starboard to starboard, and in navigating so close to the submerged crib as to afford insufficient space for the McNaughton to properly navigate with the scow. That the ahead tug and scow were safely passed by the Merida does not show that sufficient room was allowed the McNaughton and tow for reasonably safe navigation; for the ahead tug was turning the gas buoy when the steamer passed, a manifestly different position than that of the McNaughton and tow.

But the McNaughton was also faultily navigated. Her master perceived, shortly after blowing the passing signal, and when close to the Bottle Light, that the steamer was holding her course too far over to the southward, and, knowing of the nearness of the submerged crib, he nevertheless continued to the southward of the usual course towards the gas buoy without signaling the steamer. He claims that the three-blast signal was intended for an alarm or admonition to the Merida to stop and reverse; but of this I am not convinced. I believe the signal

was to request her to come ahead slowly, a signal with which she complied. There was a roll of the waves toward the submerged crib, and the McNaughton should have anticipated the sheering of the scow. Not having done so, she must be held in fault for altering her course without seasonably signaling the Merida to stop and reverse, and for navigating her tow across the path of the Merida.

Both vessels, the steamer and the tug, were in equal fault for the sinking of the scow, and therefore the damages will be divided, without costs to either party.

So ordered.